ADVANCE LOAN SERVICE et al.,
Appellants,

v.

Charles L. MANDIK, Appellee.

No. 15215.

Court of Civil Appeals of Texas.

Dallas.

Sept. 27, 1957.

Rehearing Denied Oct. 25, 1957.

Farley Reasonover and Eldon R. Vaughan, Dallas, for appellants.

Fritz & Vinson, Dallas, for appellee.

## YOUNG, Justice.

This is a usury case, appellee as plaintiff recovering damages of the four Loan Companies involved, as follows: Actual, $13,500, usurious interest (doubled), $2,174.24, and exemplary, $5,000; or an aggregate amount against the three individual defendants of $20,424.24. Defendants were Jack Dodson, Mrs. F. N. (Nell) Bond, and Mrs. L. N. Harris; Dodson owning a 60% interest in Reliable Service Company and a 50% interest in the other three. Nell Bond owned the remaining interest in Advance Loan Service and Reliable Service Company; and Mrs. Harris owned the remaining interest in Mutual Loan Service Company and Credit Loan Service. Usurious nature of the various loan charges does not appear to be questioned; in other words, that the alleged unreasonable collection efforts on part of defendants and their employees had been made pursuant to collection of usurious loans.

Here maintained are virtually four lawsuits presented in a single record; thirty issues submitted for each loan company; all similar save as to initial issues applicable to the succession of transactions had with the several concerns. In interest of brevity the jury findings may be generalized; the loan companies being sometimes referred to as Advance, Reliable, Credit, and Mutual. For example, issues 17, 47, 77 and 107 rel- ative to Advance Loan Service inquired whether over a named period it had engaged in unreasonable collection efforts against plaintiff; issues 18, 48, 78 and 108 of whether the collection efforts of Advance were made with reckless disregard of plaintiff's health and welfare; issues 19, 49, 79 and 109 of whether Advance made collection efforts with purpose of causing plaintiff mental or emotional pain and suffering, also loss of work; and issues 21, 51, 81 and 111 of whether the collection efforts of Advance were the proximate cause of mental or emotional pain and physical illness, or any loss of compensation or employment to plaintiff. All the foregoing issues were answered in the affirmative, with like findings with respect to Reliable, Credit, and Mutual.

Issues 22, 52, 82 and 112 relate to actual damages (harassment and medical services), and the jury finding as to amounts against the four loan companies is as follows: "Issue 22: What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence would reasonably compensate plaintiff for the mental or emotional pain, if any, physical illness, if any, and loss of compensation, if any, including reasonable and necessary costs of physicans' services, if any, in the past, if you find there have been any in the past, and in the future, if you find that in reasonable possibility there will be any in the future, resulting proximately from the collection efforts of (particular company), if any you have found? * * * Answer: $3125.00."

Issues 22A, 52A, 82A and 112A likewise relate to compensation for medicines and liability of each loan company therefor, as follows: "Issue 22A: What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence will reasonably compensate the plaintiff for medicines, if any, reasonably and necessarily used, or to be used, by him as a proximate result of the collection efforts, if any, of (particular company), in the past, if you find there have been any in the past, and

in the future, if you find that in reasonable probability there will be any in the future? * * * Answer $187.50."

Similarly, issues 25, 55, 85 and 115 inquire if the collection efforts of each loan company were actuated by malice, with affirmative answers. Further findings were that the individual defendants (Dodson, Mrs. Harris and Nell Bond) either authorized, had notice of, or ratified the malicious collection efforts of the company of which they were part owner, and that each should be required to pay to plaintiff exemplary damages of $625.

The points on which this appeal is predicated may be adequately summarized: Complaining of (1) gross excessiveness of jury verdict, manifesting prejudice and passion on part of the jury and disclosing a "complete disregard of the evidence"; (2, 3) jury findings 22, 52, 82 and 112 (award of actual damages) are insufficiently supported by and are against the weight of the evidence; so excessive in fact as to manifest a total disregard of the evidence by the jury, even to extent of passion, prejudice and bias; (4, 5) jury findings in response to issues 22A, 52A, 82A and 112A are without support in the evidence; there being no competent testimony showing the reasonable and necessary expenditures for medicines; (6, 7) issues 27, 57, 87 and 117 awarding exemplary damages are so grossly excessive as to manifest passion and prejudice by the jury; there being no evidence of malicious collection efforts on part of the respective defendants; (8) jury answers in response to issues 25, 55, 85 and 115 are without support in the evidence, in that there is no evidence that the collection efforts of respective defendants were actuated by malice; (9, 10) that jury answers to issues 30, 60, 90 and 120 on exemplary damages are (a) so grossly excessive as to manifest complete disregard of the evidence, also passion and prejudice; (b) no evidence in support of any malicious collection efforts on part of defendants or either of them; (11, 12) jury answers to issues 14, 44, 74 and 104 inquiring as to amounts actually paid by plaintiff as premiums for credit insurance are without support in the evidence; likewise as to jury answers to issues 16, 46, 76 and 106 concerning amounts paid by plaintiff as service charges in excess of the reasonable value of special services.

Points 13, 14, 15, 16: Complained of as against weight of the evidence are jury answers to issues 17, 47, 77 and 107 (unreasonable collection efforts); issues 18, 48, 78 and 108 (unreasonable collection efforts with reckless disregard of plaintiff's health and welfare); issues 19, 49, 79 and 109 (that such collection efforts were for purpose of causing plaintiff mental and emotional pain and suffering); and issues 21, 51, 81 and 111 (collection efforts were proximate cause of mental or emotional pain and physical illness, or loss of compensation or employment to plaintiff); point 17, the court's error in admission of Exhibits 200 through 230 (bottles of medicine which plaintiff testified as having consumed under medical prescription); and point 18, error in admission of the answer of Dr. Dennis, plaintiff's witness, to written interrogatory No. 41.

Nature of the foregoing points necessarily requires a careful examination of an extensive record (764 pages of testimony, 285 Exhibits); the evidence, if any, touching upon jury findings so challenged to be viewed most favorably from standpoint of the party obtaining the verdict. A comprehensive statement thereof, submitted by appellee, is believed to be accurate and will be availed of at length.

Plaintiff first borrowed at Reliable December 30, 1950, which Company then referred him to Advance, then by that lender to Credit, and on to Mutual. The four offices conducted certain aspects of their business in common, shifting employees back and forth as needed, all making regular reports to Dodson who visited them daily. The following testimony in résumé came from plaintiff Mandik unless otherwise indicated:

That from the latter part of 1952 through July 1954, over which period the four loan

companies claimed that he was delinquent on his accounts, their representatives flooded him constantly with phone calls; tones of voice domineering, calling him on the job, sending approximately one hundred demand letters. One Miller of Credit visited Mandik on his job at Askins Clothiers, November 1952, insisting that he go to the loan office; making collection contacts on Mandik two or three times at Askins; on other occasions at Mandik's home and at his place of later employment; the calls lasting some twenty minutes. Roberts, also a Credit Collector, made additional demands on Mandik in front of Askins Store, insisting that he do something right away; on these contacts twice calling plaintiff a "dead beat", once saying that he was worse than a "dirty g— d— negro." Mandik had told Mrs. Harris and Mrs. Bond that the harassment was affecting him physically; the former promising to stop the contacts, but did not; the latter stating that she didn't care how she got her money, just so she got it. Once when Mandik was about to obtain employment at Bell Aircraft, these loan offices called the Company before he was formally accepted; he never being able to secure employment there. Written notices of a loan due would be followed by phone calls and personal visits by collectors, both day and evening. Even after removal of Mandik to Oklahoma they called him at place of employment and at home. When Mrs. Harris would call about a payment, she did not use a rough tone of voice, but same would be followed by a rough call from another in her office. A former collector for Mutual (Lontos) testified to locating Mandik on his job in Oklahoma, calling him long distance. This witness described the routine of the four offices in collection methods, i. e., to call the party day after delinquency, send him a reminder and keep after him; the manager's suggestion on how to get in delinquents being inclusive of special delivery letters, telegrams, making week-end visits, with contacts as late as 10:00 o'clock at night and early as 5:30 in the morning.

Mrs. Edna Bennett, operator of a Debt Counselor's agency, testified to Mandik's enlisting her aid in handling his accounts, she so advising the four loan companies. Each office called her frequently, Reliable first claiming a balance of $123.20, and then after receiving a payment by check indicating balance due, the office called to say that $203.40 was the correct balance; that she had called Credit and verified the amount due by Mandik as $330.30, and upon sending a check ($10.00) they called to say the balance due was $400 and then upped it to $436.80; that similarly Mutual, after a payment, had upped their first verified balance of $199 to $274.56; that Miller of Credit made numerous calls, was threatening and obnoxious. The four offices sent her from 75 to 100 letters which she forwarded to Mandik; the calls coming in so fast from Advance that she couldn't keep a record of them; that Mrs. Bond called her (Mrs. Bennett) in January 1953 to say that she had talked to Mandik on his job and that if she didn't get a payment, would continue to do so.

Defendants Dodson and Harris went to Lawton, Oklahoma, on July 28, 1954, visiting Mandik twice; that they talked with him half an hour, or until plaintiff had to leave for his 2:00 to 11:00 P.M. work shift, Mrs. Harris saying she would call the next morning at 11:00 o'clock, she coming at 9:00 o'clock, along with Dodson; that they stood outside talking to him through the screen door because he wouldn't let them in, Dodson telling him that his (Mandik's) lawyer was no good, didn't have a good reputation among Dallas lawyers, would cheat plaintiff out of everything and was dishonest. Three of the four loan companies reported Mandik to. the Merchants Retail Credit Association, which concern furnishes reports on financial reputation of debtors, available to all members of the Association.

That before all these collection contacts, Mandik had been in good condition, able to eat, sleep, enjoying life and doing his work without undue worry; having no

voice trouble or any of the other ailments that later developed. The letters, calls, and other contacts, he said, started making him nervous; could not sleep or concentrate on job, beginning to feel a let-down. The contacts affected his blood pressure, causing him to have "crying jags", losing weight, and bad condition physically and as to nerves, the latter condition affecting his voice, which worsened; receiving treatment from Dr. Buford of Dallas and Dr. R. P. Dennis of Lawton, Oklahoma, by way of medicines, shots and sedatives; that at time of trial he had been under their care for approximately three years. Immediately after receiving a call, a "crying jag" would come on, and heaves; becoming so upset that he could not eat, developing a nervous stomach and contracting violent headaches, making it impossible to do his work; it getting to where the contacts would cause him to "throw up"; that such was still going on—indigestion, headaches, and sleeplessness. His upset ·condition caused him alternatively to lose and gain much weight, varying from a normal of 185 to a high of 249 pounds. Mandik's voice became so weak during the trial that the court reporter was required to repeat his answers to the jury, Mandik at one time bursting into a "crying jag." Because of aforesaid illnesses, plaintiff testified to losing 30 days from work in 1953 and from 40 to 45 days in 1954, of which a full two weeks was on direction of Dr. Dennis. His pay in 1953 was $16 per day and $17 to $19 per day in 1954, losing some half days until 1955.

Dr. Ben Buford testified to treating Mandik as a patient on February 2 and 16, March 9, 1953, September 1954, and March 18, 1955; Mandik giving a history of hoarseness and loss of voice and nervousness; on examination finding elevated blood pressure, raspy and quivery voice, a condition of upset without observable cause. His medical diagnosis was an emotional upset without cause physically; prescribing phenobarbital and banthine to relieve tension; Dr. Buford testifying that if plain-

tiff was not relieved of the strain, the chances were very good that he would continue to have some symptoms in the future. Answering a hypothetical question, he said that Mandik's condition could have been caused by the harassments explicit in the question; the case being termed one of "anxiety neurosis." Dr. Buford fixed the sum of from $25 to $50 as a reasonable and necessary charge for his services, and $2.50 per bottle for the prescriptions; to be taken so long as Mandik's symptoms continued, requiring a new bottle each six days.

Dr. Robert P. Dennis testified to first examining and treating Mandik on February 10, 1954, obtaining a history of hoarseness, loss of sleep, anxiety and fatigue; sending patient to other specialists who made a laryngoscopy, using sodium pentothal. The medical diagnosis was chronic laryngitis, secondary to anxiety neurosis, substantiated by gross tremor of the hands and fingers, inability to sleep, excessive perspiration, high blood pressure (moderate). In answer to a hypothetical question, this witness testified that collection demands such as the testimony reflected in this case could have unquestionably caused or aggravated Mandik's illness. He last saw the patient in July 1955 and in his opinion plaintiff's condition would continue for several years, with need of further treatment, and the hoarseness might be lifelong. Dr. Dennis prescribed drugs for plaintiff, listing prescriptions, the reasonable cost of which was $100; his service charge was $79;. for the laryngoscopic examination $100; and that the reasonable cost of future medical expense would be $500. Mandik took the prescriptions given by his doctors, testifying to having spent more than $500 for prescribed medicines. He paid Drs. Dennis and Aycock their itemized bill; to a Dr. McDonald $25, and to Dr. Ben Buford between $30 and 35.

Appellants refer to other testimony (generally from appellee) which demonstrates, they claim, "that the jury ignored the evidence and assessed damages without regard to the proof tendered them"; for ex-

ample, that Bond and Harris told him not to worry about his accounts; the latter saying she was one of his best friends, would help him at any time, was always nice, as were other employees; that notices sent him were not cruel or harsh; that collectors' calls admittedly reached their peak in August 1952, after which time Mandik had written defendants for money, receiving it. Testimony of former employees of defendants (Lontos, Hernandez and Dean) disavowed any acts on their part amounting to unreasonable collection efforts; that Mandik had a case of nerves and high blood pressure back in 1951, requiring sedatives; that he was a man of outstanding ability, wide business experience, with good earning capacity; now having a responsible job, making more money than before; that he was a single man, with other loan company accounts, and a pending suit against a third-party lender for like damages.

■ Notwithstanding above defensive analysis of the record, we cannot say that the jury findings were in complete disregard of the evidence; or that same were supported by no evidence at all or by insufficient evidence. Conflicts or inconsistencies, if any there be, in the testimony of Mandik, for instance, were for the jury to reconcile. Excessiveness of verdict is complained of in matter of actual damages; appellants citing other cases where a less amount was imposed but where the liability and extent of damages were "incomparably greater." However, as counsel observes, each case involving an unliquidated demand must turn upon its own facts; the instant situation not disclosing an award of damages so unreasonable as to warrant a suggestion of remittitur.

In the same connection, appellants argue insufficiency of evidence in support of the jury findings of compensation to appellee for medicines; and *no* evidence of probative force to support any such findings in excess of $352.50. Upon review of the testimony pertinent to these points we find same without merit. Mandik testified that

he took the medicines prescribed, involving an expenditure of more than $500. That same, together with the $250 for future medication, testified to by Dr. Dennis, would sufficiently account for the jury award as against the four loan companies.

■ The award of exemplary damages is likewise attacked as grossly excessive, indicative of bias passion, prejudice,—and a total disregard of all evidence adduced; appellant Dodson in particular arguing that he can be held liable for acts of another partner only upon grounds of authorization, participation, or ratification, not shown by the record. Additional testimony on this subject by individual defendants is this: That Dodson checked the daily delinquent report sheets but paid no attention to the collection activities of employees; that he could not recall any offer to refund alleged wrongful collections, although on notice of "the way that they were charged and the way they were collected"; testifying that after filing of the lawsuit, he had never reprimanded or discharged any employee charged with excessive collection contacts; Mrs. Harris taking the position that nothing had been done by way of collection efforts to hurt Mandik; Nell Bond, that such charges were false. The series of collection efforts participated in by these loan office owners, which the jury has found to be unreasonable, extended over approximately two years, and can be appraised as even more aggravated in kind than reflected in Wright v. E-Z Finance Co., Tex.Civ. App., 267 S.W.2d 602. Here the exemplary damage assessed was reasonably proportioned to actual damage sustained; and ratios may properly be considered in a determination of whether passion rather than reason has dictated the award of exemplary damages. 13 Tex.Jur., p. 396.

Appellants challenge as without any support in the evidence jury findings 14, 44, 74 and 104—amounts paid by appellee as premiums for credit insurance and service charges on each loan; calling attention to the well settled rule that the double damage provision of Art. 5073, Vernon's Ann.Civ.

St., pertains only to such usurious charges as are actually paid by the borrower. Jennings v. Texas Farm Mortgage Co., 124 Tex. 593, 80 S.W.2d 931; Ware v. Paxton, Tex.Civ.App., 266 S.W.2d 218. The points (11 and 12) are overruled. Amounts of credit insurance premiums and service charges on each loan were shown on rate charts in evidence as well as in testimony of the loan office owners. The fact that these charges were actually paid by Mandik is reflected in ledger cards and daily report sheets; also demonstrated by Exhibit 184, a recapitulation of loan transactions had with Reliable from beginning to end.[1]

### (Exhibit 184)

"Schedule of Loan Series at Reliable
Beginning December 30, 1950.

| Date | 'Loan' | Cash | S.C. | Int. | Ins. | Total Charges | | Payments |
|---|---|---|---|---|---|---|---|---|
| Dec. 30, 1950 | 25.00 | 25.00 | .25 | .00 | 8.95 | 9.20 | 1/6/51 | 2.85 |
| | | | | | | | 1/12/51 | 2.85 |
| | | | | | | | 1/19/51 | 2.85 |
| | | | | | | | 1/27/51 | 2.85 |
| | | | | | | | 2/3/51 | 2.85 |
| Feb. 10, 1951 | 25.00 | 9.90 | .25 | .00 | 8.95 | 9.20 | 2/10/51 | 2.85 |
| | | | | | | | 2/17/51 | 2.85 |
| Feb. 24, 1951 | 50.00 | 21.50 | 2.00 | 1.60 | 15.40 | 19.00 | 2/24/51 | 2.85 |
| Mar. 17, 1951 | 60.00 | 7.00 | 2.00 | 1.67 | 19.53 | 23.20 | 3/15/51 | 11.50 |
| | | | | | | | 3/31/51 | 10.40 |
| | | | | | | | 4/16/51 | 10.40 |
| May 19, 1951 | 65.00 | 25.00 | 2.00 | 1.71 | 22.49 | 26.20 | 5/16/51 | 20.80 |
| | | | | | | | 6/2/51 | 11.40 |
| | | | | | | | 6/16/51 | 11.40 |
| | | | | | | | 6/30/51 | 11.40 |
| July 14, 1951 | 65.00 | 21.40 | 2.00 | 1.71 | 22.49 | 26.20 | 7/14/51 | 11.40 |
| | | | | | | | 7/28/51 | 11.40 |
| | | | | | | | 8/15/51 | 11.40 |
| | | | | | | | 8/31/51 | 11.40 |
| Sept. 15, 1951 | 65.00 | 9.00 | 2.00 | 1.71 | 22.49 | 26.20 | 10/19/51 | 11.40 |
| | | | | | | | 10/26/51 | 11.40 |
| | | | | | | | 11/21/51 | 12.00 |
| | | | | | | | 12/4/51 | 15.00 |
| | | | | | | | 12/17/51 | 11.40 |
| | | | | | | | 1/4/52 | 11.40 |
| | | | | | | | 1/12/52 | 18.60 |
| Totals | $355.00 | $118.80 | | | | $139.20 | | $246.90" |

This Exhibit, at head of columns, showed date of transaction, loan, cash received, service charge, interest, insurance, total charges, and payments made by Mandik. On December 30, 1950, a $25.00 loan will be noted, all charges thereon $9.20, payments of $2.85 weekly through February 10 totaling $17.10, when, according to Mrs. Bond, Mandik "balanced out and renewed." He was given credit for all payments, leaving $17.10 balance due on first loan; was allowed a $2.00 bonus, or $9.90 cash on the succeeding $25.00 loan of February 10; the same routine of charges and credits going through the whole series.

It appears that credit insurance policies issued on each transaction of loan included life, health and accident, and until around December 1952, hospitalization; that the individual defendants retained from 85% to 91% of the premiums collected; that refunds on canceled health and accident policies upon payment of a loan (when made) were not in accord with insurance regulations pursuant to Art. 3.53, sec. 10, Insurance Code; Dodson testifying that he relied upon commissions from sales of credit insurance policies for the successful operation of his loan offices.

■■ Points 13, 14, 15 and 16 complain of the jury responses to numbered special issues as "against the weight of evidence"; it being thereby conceded that such findings have support in testimony of probative value, *but of lesser weight.* " * * * The mere fact that a verdict is against the preponderance of the evidence will not authorize the Court of Civil Appeals to set it aside, if there is some evidence to support it, or evidence which would support a verdict either way. The appellate court will set aside the verdict and findings of a jury only in cases where they are so against such a preponderance of the evidence as to be clearly wrong, or show clearly that the conclusion reached was the result of some passion, prejudice or improper motive, or in such obvious conflict with the justice of the case as to render them unconscionable * * *." 3–B Tex.Jur., sec. 940, pp. 453–456.

■■ Point 17: Over objections of appellants the court permitted a placement in evidence of some thirty bottles or containers, variously sized, representing medicines allegedly consumed by appellee; arguing that the Exhibits bore no relevancy to any issue, were prejudicial and introduced "solely for the purpose of inflaming the minds of the jurors, which purpose was manifestly well served." The demonstrative evidence in question was admissible in part corroboration of the testimony of Mandik that he had in fact purchased and used medicines of the kinds and to the extent indicated, on advice of his doctors. "Objects to which testimony relates may be brought into court and exhibited when this can be done, and this is more satisfactory than a description of the object by witnesses who have inspected them outside the court." 17 Tex.Jur., pp. 465–6.

■■ In answer to written interrogatory No. 41, an inquiry concerning the basis of his medical opinion, Dr. Dennis was permitted to testify that "The appellee stated that his nervous symptoms were due to continual demands by organizations to collect sums of money * * *." Appellants objected on the grounds that the statement was self-serving and hearsay, not one of subjective or objective symptoms but an expression of the patient as to cause of his condition, given to the physician in order to qualify him as a witness on the trial. Mandik first appeared in the office of Dr. Dennis in February 1954 (after filing of this lawsuit, though whether Dr. Dennis knew of the pending suit is not shown). Further testimony of the witness is quoted:

"Q. Did you undertake the treatment of Mandik at that time? A. Yes.

"Q. Did you continue to treat Charles Mandik? A. Yes. * * * A. On February 10, 1954, the patient was given sedatives, instructed regarding voice rest and sedatives in treatment of his chief complaint of hoarseness and tightness in his throat. He was seen again June 14, 1954, and at that time it was thought that possibly a tumor growth was present in the voice box or vocal cords and the patient was instructed to stay off work and have strict voice rest, with no speaking at any time for a period of two weeks.

"Q. Did your treatment involve hospitalization? A. Yes.

"Q. If your answer to the preceding question is yes, please explain fully the reason for the hospitalization. Also with regard to hospitalization, please explain fully what was done at the hospital. A. At the end of two weeks, because of the apparent seriousness of the involvement, and to simplify possible future treatments, a letter concerning Charles Mandik was sent to Dr. J. C. McDonald at the Oklahoma City Clinic regarding his condition, and arrangements made for his hospitalization and examination on July 12, 1954 * * *." Above testimony demonstrates that Dr. Dennis had been employed by Mandik for purpose of treatment, during which relationship a history of the latter had been obtained, inclusive of the statement in question. The history given by a patient to

a doctor for the sole purpose of qualifying him as a witness will be permitted. Texas Employers' Ins. Ass'n v. Wallace, Tex.Civ.App., 70 S.W.2d 832. But in the instant situation admissibility of interrogatory No. 41 and answer has validity in the further rule, well established, that: "Opinion testimony of a physician is not rendered incompetent by the fact that it is based, partially at least, on subjective complaints or declarations given by the patient to the physician on the latter's examination of the patient, when the examination was made for purposes of the treatment and cure of the patient." 51 A.L.R.2d 1057, Medical Expert Opinion—Admissibility; (citing many Texas cases.)

Moreover, the particular testimony of Dr. Dennis was merely cumulative at most. This medical witness had reached the same conclusion in answer to hypothetical questions based on facts in evidence. Dr. Buford had given a similar opinion with no reference to Mandik's history of collection contacts; the latter repeatedly testifying that such was the source of his injuries.

The points of appeal present no errors deemed reversible; and the judgment under review must be accordingly affirmed.

### On Motion for Rehearing.

Ground 6 of appellants' motion reads:

"The Court of Civil Appeals erred in affirming the judgment of the trial court which was based upon issues submitted in a divisible manner regarding the damages sustained by the appellee, which issues inquired of the damages sustained by the appellee as a result of the actions of the four respective loan offices, whereas the proper issue was what was the total damages sustained by the appellee, as held by the Supreme Court of the State of Texas, in the case of Riley v. Industrial Finance Service Company, Tex.1957, 302 S.W.2d 652."

Thus attempted to be raised for the first time is a point not heretofore presented in trial court or on appeal. Appellants have wholly failed up to this juncture to assert error with respect to the matter in question. Specific instances of such failures are: In second amended original answer; in exceptions to the charge (not made part of the record by appellants); in their amended motion for new trial; and lastly in the brief of appellants filed in this Court. They are therefore not entitled to now complain of manner of submission of the damage issues on motion for rehearing.

Said motion, upon consideration, is in all things overruled.