**V. L. WARE, Appellant,**

v.

**J. S. PAXTON et ux., Appellees.**

No. 15779.

Court of Civil Appeals of Texas.
Dallas.

Oct. 27, 1961.

Rehearing Denied Dec. 15, 1961.

Allen Melton and George M. Elliott, Dallas, for appellant.

Fritz & Vinson, Dallas, for appellees.

YOUNG, Justice.

This is a second appeal of appellant's suit against appellees of date December 29, 1950 on a note for $3,048, foreclosure of chattel mortgage and reasonable attorney's fees; countered by the Paxtons' cross-action for double the amount of usurious charges allegedly paid within two years (Vernon's Ann.Civ.St. Art. 5073); also for damages for claimed unreasonable collection efforts. See 266 S.W.2d 218, where the Eastland Court sets forth in detail the facts antecedent to first trial and the issues there raised and considered. The District Court on first trial had rendered

judgment for appellees for $181.84; finding usury in amount of $936.40 which the East-land Court concluded was not sustained by the record, and reversed the case for further development of amount of usury, if any, holding in such connection that "the execution of a new note or obligation to the original lender which included unpaid usurious interest made to the borrower on a prior indebtedness is not payment of such usurious interest;" and that the right to recover double the amount of usury under Art. 5073 is confined to usurious interest charges which have been *actually paid*.

On this second trial, likewise to a jury, the court rendered judgment denying any recovery on the note in suit, finding usurious interest in the amount of $690 paid within two years from date of cross-action on which the Paxtons were entitled to double recovery; with a net result after due off-sets and credits of "$861.66 double damages for usurious interest, computed as reflected in Exhibit A prepared by the Court and attached hereto". Also, based on jury answers there was an award to the Paxtons of $15,000 actual damages for unreasonable collection efforts and $10,000 as exemplary damages together with legal interest from date of judgment of November 9, 1959.

■ Prior to the second trial of 1959 and before introduction of evidence plaintiff (appellant) filed first and second trial amendments, reducing his cause of action to a balance of $1657.10 his declared intention being "to remove from the lawsuit any issue pending as to usurious interest, brokerage fees, insurance premiums, or any other charges"; claiming that he sought judgment only for that principal balance on the monies loaned by him with legal interest from December 29, 1950, together with foreclosure of chattel mortgage. He now vigorously asserts through numerous points that by thus reducing his claim by $1340.90 as of December 29, 1950, he has eliminated all usury as a defense. The trial court properly rejected this plea, which

is untenable as a matter of law; as well as being inimical to many jury findings. We deem it unnecessary to detail the contents of the present jury verdict, embracing some 46 issues and answers; they being essentially similar to those fully discussed on first appeal. Issues 26 and 27 for example which appellant does not seriously attack, find that Ware failed to give Paxton credit for $1148 on the loans involved. Appellees claim the note sued upon of $3048 was usurious in its entirety; and appellant in the same connection states that "had Paxton paid Ware the full $3048 he would have paid usury". He cannot by an ex parte determination of over-charges thus eliminate entirely the question of usury.

The instant trial did not follow usual procedure. Plaintiff Ware first placed the Paxtons on the stand who admitted signing the $3048 note of December 29, 1950, put same into evidence and rested. Paxton then called Ware to the stand, who produced various notes, ledger sheets, contracts for loans, credit insurance applications and other papers, reflecting the continuous series of loan transactions from June 7, 1947 to December 29, 1950; all of which were introduced for the limited purpose of demonstrating the amounts that the Paxtons were required to sign for and also amounts Ware admitted as having been repaid according to his records. Paxton then took the stand, testifying to various differences in the amounts received by him in contrast to the amounts reflected in the records of plaintiff Ware, for example in the Mercantile Bank Loan of January 9, 1950 ($3744) the $576 received by Ware in such transaction being treated on previous appeal as "additional interest". Paxton likewise called to the stand one Canterbury, the accountant for Ware, who testified to an itemization from the latter's records of the amounts advanced to Paxton and repaid by him, based on conversation between himself, (Canterbury) and Ware; making summary thereof which reflected a balance due Ware of $1697.10—the amount now sued for under trial amendments.

· Appellant presents 28 points on appeal, arguing same in groups. They do not refer to any assignment of error in amended motion for new trial to which they are germane as required by Rule 418, Tex.Rules Civ.Proc.; in fact appellees charge that many of them are not covered by the 253 assignments of error at all and therefore should be stricken. Other deficiencies of briefing rules are pointed out which we do not pause to discuss. For notwithstanding this, it is manifest from appellant's brief as a whole, that the prime consideration on this appeal relates to the jury findings of damages, both actual and exemplary.

■ In appellant's first series of points, he asserts that Paxton accepted above figures of Canterbury as correct, vouching for him as a witness. However, this would not preclude plaintiffs from contradicting the testimony of Canterbury as distinguished from attacking his credibility. Aetna Life Insurance Co. v. Love, Tex.Civ.App., 149 S.W.2d 1071. And in the testimony of Paxton he alludes to several differences of fact between his own version as to amounts received and repaid to Ware, in the latter column alone these differences amounting to $1148 (Jury answer No. 27). Furthermore, in issues and answers 2 through 25 (only generally attacked by appellant) are findings favorable to the Paxtons' plea of usury; and findings 28 through 32 are in accord with Paxton's testimony that he had not received as much as appellant had stated in connection with transaction of several dates. In sum, the trial court's judgment (Exhibit A) which fixes March 22, 1949 as the cut-off date for double damages, that between that date and December 13, 1949 Paxton had actually paid in cash, as interest, $690 more than he received for which Paxton was entitled to double damages

totalling $1380. Exhibit A further reflects that in the period of January 1950 to December 29, 1950, Paxton received $1682.60 more than he had repaid; and after subtracting this $1682.60 from the totals of $1148, $1380, and $6.26 (over payment prior to March 21, 1949) the trial court arrived at an excess in favor of Paxton of $851.66 designated by the trial court as "net usury judgment."

On the other hand it is the contention of appellant (points 10 through 13) that the effect of jury answers 26 and 27 was to establish $1148 as in full of all credits to which appellees were entitled; which amount subtracted from his claimed balance due of $1697.10 left $549.50 for which he should have judgment; necessarily precluding any recovery for usurious interest in this lawsuit. In this connection appellant, in reply brief, submits an exhibit parallel to the court's Exhibit A, fixing March 31, 1951 as the cut-off date for establishment of double damages; obviously following the finding in Ware v. Paxton, first appeal, to such effect. Appellee assumes March 21, 1951 as the true date of his original cross-action; while in the transcript there appears another date of filing—April 2, 1951. The instant judgment fixes March 21, 1951 as the cut-off date for findings of double damages as to which no point of error is made and must be deemed controlling. The difference in dates would affect only Paxton's $200 payment of March 22, 1949, which amount, even if barred, would still constitute a credit item due appellees of that amount. Adleson v. B. F. Dittmar Co. (Ad.Sup.), 124 Tex. 564, 80 S.W.2d 939.[1]

■ Jury answers to issues 34 through 46 were as follows: that Ware made unreasonable collection contacts upon J. S.

1. In Appellant's parallel exhibit he uses the trial court's figures (Exhibit A) of amounts received by Paxton and repaid to Ware. It thereby demonstrates that during the entire period Paxton was advanced $4,700.00, and repaid $3,507.50, leaving a balance due to Ware on all transactions of $1192.50; that subtracting from the sum the jury finding of $1148 for which Paxton was not given credit, leaves $44.60 to Ware; that Paxton was due an allowable credit of $206.26 for overpayment of principal prior to the two year period, and when the $44.60 is subtracted therefrom, leaves a balance due Paxton of $151.66.

Paxton between March 14, 1949 and March 14, 1951 for purpose of collecting the loans; that after such contacts Paxton suffered mental or emotional pain and physical illness; Paxton's resulting damages amounting to $10,000. Ware made unreasonable contacts between March 14, 1949 and March 14, 1951 on Bertha L. Paxton to collect the loans; after such contacts Mrs. Paxton suffered mental or emotional pain and physical suffering; such collection contacts by Ware were a proximate cause of such mental or emotional pain and physical illness; resulted damages to Mrs. Paxton was $5,000; Ware made unreasonable contacts on Mrs. Paxton in January 1956 to collect the loans; after such contacts Mrs. Paxton suffered mental or emotional pain and physical illness; such collection efforts of Ware were a proximate cause of the mental or emotional pain and physical illness of Mrs. Paxton; resulted damages to Mrs. Paxton was $5,000. Ware acted with malice in making the various collection efforts aforesaid; and the amount of exemplary damages that should be awarded against Ware was fixed at $10,000. The cross-action of appellees being for $25,000 only, the total of actual damages was reduced to that amount.

Appellant's points 14 through 22 are to effect that jury answers on actual damages were each against "great weight and preponderance of the evidence"; the answer on exemplary damages being unsupported by any "evidence of malicious collection efforts on the part of V. L. Ware"; and likewise were so grossly excessive as to manifest passion and prejudice and in complete disregard of the evidence.

Turning to the record, it was the testimony of the Paxtons living near Midlothian, that from late in 1949 to late 1950 Ware made 'phone calls to the Paxton farm, reaching Mrs. Paxton several times; and Paxton on one occasion (December 5, 1950) leaving his 'phone number on several other occasions which Paxton answered on returning home. Concerning the December 1950 episode, he related a 'phone call from Ware, saying that he was behind with his payments, threatening to send the Sheriff down to pick up everything he had; that as a result: "It just seemed like it went all over me. Well, I just turned blind and would have fell over and the boys caught me, and I just went to Waxahachie to a doctor. * * * Well, my heart just quit beating and when I come up it felt like everything—it just wouldn't work. Well, the boys took me to the doctor in Waxahachie * * * he's dead now * * * Dr. Jackson". Paxton, 67 years of age at time of trial, testified to having had no doctor for many years prior to the experience above mentioned; and in lengthy examination testified to subsequent illnesses; that his heart apparently stopped at times with pain there so that he could hardly breathe; naming several doctors he had gone to subsequently for treatment of such condition and other ailments, now having to seek medical attention every 6 to 8 weeks; that after the attack of December 5, 1950 it was some 18 months before he could "saw a 2 x 6", not being since able to work much in farming or in the exterminating business, his boys doing it for him. In 1948 he had netted an income of $3640, in 1950, $2500. After the attack of December 5, 1950 his income had dropped to net loss in 1951 and 1952 of $650. In 1953 there was a net profit of $1850; in 1954 a net loss of $1100; in 1955 through 1958, net profits of $2100, $1400 and $1,000 for those years respectively.

In issue 38, the jury likewise answered that between March 14, 1949 and March 14, 1951 Ware made unreasonable collection efforts on Bertha Paxton for the purpose of collecting the loans herein; also (issue 41) in January 1956. Paxton testified at some length with respect to the condition of his wife's health between these dates, although Mrs. Paxton relates no instances other than a usual run of 'phone calls and letters for her husband from Ware. Relative to her contacts with Ware during 1949–1950 she testified on direct examination:

"Q. And state the facts as to what else if anything, was said in those conversations? A. Well, I don't remember particularly as to what was said except one where he asked me where he was and I told him that he was in Longview, and he says, 'What's he doing down there?' and I said, 'Well, he's exterminating, I suppose' and he said 'What is he doing—exterminating or messing with lumber?' and he said he wanted the number where he might reach him." Upon cross-examination—

"Q. And you would not say, would you, that this phone call, other than for your nervous condition at the time, would have upset you, would it? A. It might not have, if it hadn't been for my condition, but this is the point of that conversation * * * it seemed that every time we got a penny it went to Mr. Ware, and I was there in the country, and I didn't understand whether Mr. Paxton sent in * * * whether he sent in his payments, but where he was and what he was a'doin' and it wasn't any of his business what he was doing * * * whatever he done to make a livin' wasn't no concern of Mr. Ware's."

Re-direct examination:

"Q. Mrs. Paxton, when Counsel was questioning you, you mentioned about Mr. Ware's tone of voice * * * it was Mr. Ware's tone of voice that was also irritating in this matter, and I'll ask you what his tone of voice was when he made these telephone calls to you in 1950 about the note? A. Well, a sarcastic tone of voice * * * resenting or something.

"Q. What was the last part? A. Sarcastic.

"Q. And what did you say after that? A. Resentment or something of the other."

Mrs. Paxton stated that she had already been to a doctor before the 1949–1950 calls from Ware, but that above narrated conversations made her particularly nervous, developing severe headaches and nervous tension; having almost recovered from such condition when in January 1956 Ware visited her at her home in Bonham. She testified:

"Q. And what did he state at that time or say? A. Well, he said he wanted to talk to me, and I said, 'Well, I thought this thing was over with' and he said it wasn't over with and it wouldn't be until he got $3,000 out of it, and he said he wanted to see Mr. Paxton, and he could put him in jail, but he didn't want to do that, he wanted to see him, and he said that we'd * * * he suggested that we come to see his lawyer, and I told him that we had a lawyer of our own that we would see, and he said that we didn't have Mr. Fritz any more * * * he was not going to represent us any more, and I just * * * well * * *."

After above visit she said that all her old symptoms returned, head and backaches that she could hardly bear; of continued medical treatment, undergoing hysterectomy; moving back to Dallas with further treatment by doctors for symptoms of menopause when Ware's telephone calls began. She was 55 years of age at the time of the trial.

We need not dwell further on the physical ailments of Mrs. Paxton. Appellant grants that each may have been in poor health, but that such condition had no causal connection with any collection efforts. However, Dr. Robert A. Jones, their family doctor over the years, testified that emotional stress would probably aggravate the symptoms and disorders that he found in each; that in his opinion as to Mrs. Paxton, half a dozen phone calls by a bill collector might very well cause a nervous breakdown; stating that: "I think her nervous tension might well have been increased. It is entirely reasonable

for somebody having a bill collector at them would be more nervous than somebody else who didn't." Dr. Jackson, who lived at Waxahachie, and who had treated Mr. Paxton for his claimed heart attack of December 5, 1950, died soon thereafter; and while Dr. Jones at no time later treated Paxton for a heart condition, in answer to a hypothetical question stated that the symptoms described by Mr. Paxton were those of coronary thrombosis angina pectoris or heart failure.

Appellant's points 14 through 22 are generally to effect that jury answers 34 through 44 (unreasonable collection efforts) are against the great weight and preponderance of the evidence, his premise being that there is no basis in this record for any findings of wrongful collection contacts at all. In this connection he essays to compile "every statement of the appellant which is relied upon by appellees for the recovery of actual damages and the further recovery of exemplary damages for wrongful collection effort". In turn we have been duty bound to closely examine quite a voluminous record.

Conversely, it is seen under Exhibit A (the court's re-capitulation of Ware's advances and Paxton's payments) that intervening March 22, 1949 and December 13, 1949 the latter repaid to Ware the sum of $690 more than monies advanced, constituting the basis of his recovery under Art. 5073. Appellees point out that collection efforts, whether reasonable or unreasonable, depends on the circircumstances of the particular case; and that "collection efforts which might not be considered unreasonable in an effort to collect a lawful claim, might be entirely unreasonable in an effort to collect a void claim." Appellant cites Duty v. General Finance Company (Sup.) 154 Tex. 16, 273 S.W.2d 64 as requiring collection efforts far more severe than reflected in this record as the test of liability. But the Supreme Court was simply dealing with the collection efforts there pled not setting

same up as a standard; going on to say "besides, we do not hold that by reasonable efforts to collect usury a creditor runs the risk of liability for damages." As in previous trial, we conclude that there is some evidence of probative force involving the issues of unreasonable collection efforts. "The mere fact that a verdict is against the preponderance of the evidence will not authorize the Court of Civil Appeals to set it aside, if there is evidence to support it. The appellate court will set aside the verdict and findings of the jury in cases where they are so against such a preponderance of the evidence as to be clearly wrong, show passion or prejudice, or in such obvious conflict with the justice of the case as to render them unconscionable." Federal Underwriters Exchange v. Hinkle, Tex.Civ.App., 187 S.W.2d 122, p. 124. See also 4 Tex.Jur.2d p. 402.

Appellant asserts gross excessiveness of the jury findings on exemplary damages, such as to manifest passion and prejudice and a complete disregard of the evidence. He points out that this record contains no studied program of harassment, no abusive language, threats or violence, no daily personal contacts or phone calls at all hours such as is reflected in Advance Loan Service v. Mandik, Tex.Civ.App. (1957) 306 S.W.2d 754, reh. den.; Duty v. General Finance Company (supra); Wright v. E-Z Finance Company, Tex.Civ.App. (1954) 267 S.W.2d 602; Western Guaranty Loan Company v. Dean, Tex.Civ.App. (1957) 309 S.W.2d 857, reh. den.; Harned v. E-Z Finance Company, (Sup.) 151 Tex. 641, 254 S.W.2d 81; Allison v. Simmons, Tex. Civ.App. (1957) 306 S.W.2d 206. In fact on part of Mrs. Paxton during 1949–51 she says that Ware's tone of voice towards her was no more than "sarcastic"; and finally that the letters from Ware were "probably" four letters in one month. The Supreme Court case of Jones v. Ross, 141 Tex. 415, 173 S.W.2d 1022 is cited which quotes with approval from 25 C.J.S. Damages § 123, p. 726 that "The fact that an act is unlawful is not of itself ground for an award of

exemplary or punitive damages. The act complained of not only must be unlawful but also must partake of a wanton and malicious nature, or, as sometimes stated, somewhat of a criminal or wanton nature, and an act will not be deemed malicious, and so warranting punitive damages, merely because it is unlawful or wrongful."

■ In addition to the foregoing, it should be noted that jury issues and answers relative to Mrs. Paxton's recovery was for $5,000 for unreasonable collection efforts from Ware between March 14, 1949, and March 14, 1951, and $5,000 for similar contacts made by Ware in January 1956. The trial court, following the jury verdict, eliminated $5,000 of the whole recovery, as being in excess of the total amount sued for. The resulting situation is rather anomalous in that we may assume that the jury answer of $10,000 exemplary damages is based upon and has some reasonable relation to the total amount of actual damages found by the jury. We are not unmindful of the broad discretion on the part of a jury in awarding exemplary damages, but we also are cognizant of the rule which places upon us the burden of evaluating such jury findings of exemplary damages on basis of assignments challenging excessiveness thereof in the light of the overall testimony. We have given careful consideration to all factors heretofore discussed, and it is our opinion that the amount of the jury's award of $10,000 for exemplary damages is excessive to the extent of $5,000.

Points 25, 26, 27 and 28 may be disposed of briefly. (1) The statement of facts does not bear out the charge that the conversation of Ware with Mrs. Paxton in January 1956 involved "a settlement proposal". In fact, no discussion with respect to a settlement of the case is shown. (2) Nor do we find in the record any "voluntary statement of Paxton to effect that he accepted the figures of Ware's bookkeeper, Canterbury, as correct; and (3) it may be that the testimony of the Paxtons involved contradictions and inconsistencies. Even so, as a whole they did not lack probative force; and we agree with appellant that "if there were contradictions, it was within the province of the jury to determine the true facts." The points are accordingly overruled.

If appellees desire to file a remittitur of $5,000 within fifteen days from this date, judgment of the trial court will be so reformed and affirmed, otherwise said judgment will be reversed and remanded for another trial. Rule 440, T.R.C.P.; Flanigan v. Carswell, 159 Tex. 598, 324 S.W.2d 835.

### On Rehearing.

Above remittitur having been duly filed, the judgment under review has been reformed in accordance and as reformed is in all things affirmed.