**V. L. WARE, Petitioner,**

v.

**J. S. PAXTON et al., Respondents.**

No. A–8818.

Supreme Court of Texas.

July 11, 1962.

Rehearing Denied Oct. 3, 1962.

George M. Elliott and Allen Melton, Dallas, for petitioner.

Fritz & Vinson, Dallas, for respondents.

GREENHILL, Justice.

This case has a long history. It has been twice tried to a jury. Ware, a lender of money, sued Paxton and his wife on a promissory note. The Paxtons brought a cross action in which they alleged that Ware had charged them usurious interest and that they had been damaged by the unreasonable collection efforts. Upon the first trial, the jury found that Ware had not used unreasonable collection methods. In the second trial, the jury found that unreasonable collection methods had been exercised by Ware. It awarded both actual and exemplary damages against Ware for that reason. As this second appeal reaches us, the main question is whether there is any evidence to support the jury finding awarding the Paxtons exemplary damages because of Ware's collection methods. The Court of Civil Appeals found that there was evidence to support the jury's finding. 352 S.W.2d 520. We granted the writ of error on this point.

This suit was begun in 1951 when Ware sued the Paxtons upon a note for $3,048 and 10% interest thereon. The cross action of the Paxtons for usurious interest was based on Art. 5073, Vernon's Texas Civil Statutes, which provides for a double recovery of usurious interest paid. Based on fact findings that the Paxtons had paid $936.40 of usurious interest, and after allowing proper credits, judgment was entered for the Paxtons for $181.84. As stated above, the jury verdict was for Ware on the unreasonable collection methods issues. On the first appeal, the Eastland Court of Civil Appeals reversed and remanded the case for a further development of the amount of usurious interest actually paid by the Paxtons during the two-year period. 266 S.W.2d 218 (error refused, n.r.e., 1954).

The second trial of the case, likewise to a jury, resulted again in judgment for the Paxtons on the usury point. The trial court, after finding that the Paxtons paid $690 in usurious interest in the two-year period prior to the suit, entered a judgment for them of $861.66 double damages for usurious interest after offsets and credits. Based on other favorable special issue findings of unreasonable collection methods in attempts by Ware to collect the note of December 29, 1950, and of malice in connection with those attempts, the trial court awarded the Paxtons $15,000 actual damages and $10,000 exemplary damages. On the second appeal, the Dallas Court of Civil Appeals affirmed that judgment but required a remittitur of $5,000 on the exemplary damages for excessiveness, thus reducing the exemplary damages to $5,000. 352 S.W.2d 520.

The contentions of the parties and the rather involved facts of the financial transactions between them are set out at length in the Court of Civil Appeals opinion in the first appeal on pages 221–227 of 266 S.W.2d and in the Court of Civil Appeals opinion in the second appeal on pages 521–522 of 352 S.W.2d. They need not be repeated here except to state that the Paxtons received no cash from the $3,048 note of December 29, 1950. It was given instead to cover unpaid balances due on previous loans made by Ware to the Paxtons in a long series of notes and renewal notes dating from 1947 to 1950. The jury answered every special issue presented to them inquiring into the various service charges made on various loans from 1947 to 1950 that no services were performed in return for such charges. We have examined the record and have concluded that there is evidence to support these jury findings of usury and therefore affirm the judgments of the courts below in this respect.

■ There is no point of error in Ware's appellant's brief or in his motion for rehearing in the Court of Civil Appeals complaining that there is "no evidence" to support the jury findings of unreasonable collection efforts and the actual damages awarded therefor. That point is therefore not before us. Rule 418, Texas Rules of Civil Procedure.

Ware's point of error of "no evidence" to support the jury findings of malice and exemplary damages awarded as a result is before us. The evidence concerning the collection efforts of Ware is accurately presented in detail in the Court of Civil Appeals opinion, 352 S.W.2d 520, on pages 522–526, and we need not repeat all of it here. After a consideration of the facts in the record which are alleged to be some evidence of *malice,* we have concluded that there is no evidence to support the jury verdict in this regard.

The charge to the jury given by the trial court contained the following definitions of malice and exemplary damages:

"By the term 'malice' as used in this charge is meant ill will or bad or evil motive or such gross indifference of the rights of another as will amount to a willful or wanton act done intentionally and without just cause or excuse.

"By the term 'exemplary damages' as used in this charge is meant such dam-

ages as may be allowed where acts complained of are wantonly and maliciously done with intent to injure the complaining party or with a reckless disregard of the injurious consequences of his acts to others. Such damages may include compensation for inconvenience, reasonable attorneys' fees, and other losses too remote to be considered under actual damages." [Tr. 67]

In Jones v. Ross, 141 Tex. 415, 173 S.W.2d 1022 (1943), we quoted with approval the following discussion of exemplary damages from 25 C.J.S. Damages § 123, p. 726 and we repeat it here as a guidepost to our consideration of the evidence in this case:

"The fact that an act is unlawful is not of itself ground for an award of exemplary or punitive damages. The act complained of not only must be unlawful but also must partake of a wanton and malicious nature, or, as sometimes stated, somewhat of a criminal or wanton nature, and an act will not be deemed malicious, and so warranting punitive damages, merely because it is unlawful or wrongful." [173 S.W.2d 1022, 1024]

Definitions of malice and the grounds for exemplary damages are necessarily general and do not provide precise limits for the decision of cases. Where the collection methods of a lender cease merely being unreasonable and take on the character of malicious and wanton conduct is a matter of degree. To determine whether Ware's actions are of such a nature that it can properly be said that they evidence maliciousness and wantonness, we must compare the facts of this case with others where the conduct of the lender was extreme enough to be considered malicious, wanton, and indicating a reckless disregard for the injurious consequences of his acts to others.

In Duty v. General Finance Company, 154 Tex. 16, 273 S.W.2d 64 (1954), the lender carried on a campaign of continuous harassment against the borrowers from the first time the borrowers missed a payment on any of their loans. This campaign consisted of the following extreme methods:

" * * * Daily telephone calls to both Mr. and Mrs. Duty, which extended to great length; threatening to blacklist them with the Merchants' Retail Credit Association; accusing them of being deadbeats; talking to them in a harsh, insinuating, loud voice; stating to their neighbors and employers that they were deadbeats; asking Mrs. Duty what she was doing with her money; accusing her of spending money in other ways than in payments on the loan transaction; threatening to cause both plaintiffs to lose their jobs unless they made the payments demanded; calling each of the plaintiffs at the respective places of their employment several times daily; threatening to garnishee their wages; berating plaintiffs to their fellow employees; requesting their employers to require them to pay; calling on them at their work; flooding them with a barrage of demand letters, dun cards, special delivery letters, and telegrams both at their homes and their places of work; sending them cards bearing this opening statement: 'Dear Customer: We made you a loan because we thought that you were honest.'; sending telegrams and special delivery letters to them at approximately midnight, causing them to be awakened from their sleep; calling a neighbor in the disguise of a sick brother of one of the plaintiffs, and on another occasion as a stepson; calling Mr. Duty's mother at her place of employment in Wichita Falls long distance, collect; leaving red cards in their door, with insulting notes on the back and thinly-veiled threats; calling Mr. Duty's brother long distance, col-

lect, in Albuquerque, New Mexico, at his residence at a cost to him in excess of $11, and haranguing him about the alleged balance owed by plaintiffs." [273 S.W.2d 64, 65]

While classifying the lender's conduct as "outrageous," this Court went on to say:

"* * * we do not hold that by reasonable efforts to collect usury a creditor runs the risk of liability for damages. A decision of the case before us does not require that we undertake to outline the limits to which such a creditor may go, but we do hold that resort to every cruel device which his cunning can invent in order to enforce collection when that course of conduct has the intended effect of causing great mental anguish to the debtor, resulting in physical injury and causing his loss of employment, renders the creditor liable to respond in damages." [273 S.W.2d 64, 66]

The borrowers apparently sought only actual damages in the Duty case, but it has application to our case because it was considered necessary that the lender carry on a campaign of harassment in order to entitle the borrowers to *actual* damages, much less *exemplary* damages.

In Industrial Finance Service Co. v. Riley, Tex.Civ.App., 295 S.W.2d 498 (1956), affirmed 157 Tex. 306, 302 S.W.2d 652 (1957), where the facts were held to support an award of both actual and exemplary damages, the conduct complained of was similar to that of the lender in the Duty case:

"Upon failure of appellees to keep up their payments, appellants began a bombardment of collection letters, telegrams, and telephone calls, in daytime and nighttime, at appellees' home and at their places of employment. In addition the company's collectors called in person at appellees' home and places of business. There is testimony that the methods employed by appellants were 'nasty, harsh and loud,' and sometimes contained implied threats. The evidence in our opinion amply supports the jury finding that appellants' collection efforts were unreasonable and were made with malice and with reckless disregard of appellees' health and welfare." [295 S.W.2d 500, 502]

Likewise, in Wright v. E-Z Finance Co., Tex.Civ.App., 267 S.W.2d 602 (error refused, n. r. e., 1954), actual and exemplary damages were upheld where the conduct of the lender was of a similar nature:

"The record here most favorable to the judgment rendered by the trial court is: (1) The pleading alleged a conspiracy by all appellees to wrongfully harass him; in connection with the common ownership of groups of the companies or loan offices, or single individuals appellees by contemporaneous and malicious collection methods by six of the seven loan companies resulting collectively in severe mental and physical damage; that appellant was called and harassed daily by one loan office after another in an almost identical manner; each reported to the Retail Merchants Credit Association claiming a debt but not describing the debt to be in part usurious interest; from all of which appellant and wife suffered both mental and resultant personal harm." [267 S.W.2d 602, 607]

The facts of the case at bar do not show a campaign of harassment and intimidation of the sort held to support exemplary damages in the foregoing cases. In the two-year period 1949–1951, the Paxtons testified that they received several telephone calls from Ware. Mr. Paxton could only remember the substance of one of these calls: a call on December 5, 1950. He testified that on that occasion Ware told him he was behind on his payments and that he might have to send the sheriff out to pick up everything he had. The evidence indicates that Mr. Paxton may have suffered a heart attack immediately following this

call; that he was in general bad health in the years following the call; and that, following this call, he was unable to do the work which he had previously done. However, there is no evidence that Ware used abusive or insulting language or anything of that nature in the conversation of December 5, 1950, nor is there any evidence that Ware knew that a telephone call reminding Mr. Paxton that he was behind on his payments and threatening to send the sheriff out would have such injurious consequences on Paxton's health, if in fact it were the cause of that condition.

Mrs. Paxton testified that during the same two-year period, 1949 to 1951, she received several telephone calls from Ware but she could not remember how many. She likewise could recall the substance of only one of these calls. Mrs. Paxton stated that on that occasion Ware asked where her husband was, what he was doing, and how he could reach him, and that the effect of this was to make her "real nervous." She admitted that Ware did not use abusive, vulgar, or indecent language in any conversation with her, nor did he threaten any violence. The most critical comment she made as to Ware's language or tone of voice during all of the calls made to her was that it was "sarcastic." The evidence shows that Mrs. Paxton was in a bad state of health prior to Ware's telephone calls, but she stated that all of her old symptoms of head and back aches and a nervous condition returned following these calls. There was testimony by her doctor that "half a dozen calls by a bill collector might very well cause a nervous breakdown" and that her nervous tension might well have been increased thereby. But Mrs. Paxton admitted that she had not informed Ware of her condition and that there was no way he could have known she was "nervous."

Mrs. Paxton further testified that, although her old symptoms had returned following Ware's 1949–1951 telephone calls to her, she had almost recovered when Ware visited her at her home in January, 1956. Mrs. Paxton said she thought "this thing was over with and he said it wasn't over with and would not be until he got $3,000 out of it." She stated that Ware stated that he wanted to see Mr. Paxton and that he could put him in jail but he didn't want to do that. She said Ware also suggested that the Paxtons come see his lawyer; and when she told him they had a lawyer of their own, he said their lawyer wasn't going to represent them anymore. She admitted that Ware did not use abusive language or threaten any violence during this visit. She testified that following this visit all of her old symptoms returned and that she developed additional health complications. This is the only personal visit by Ware to the Paxtons' home shown by the record.

In addition to the phone calls and the one personal visit, Mrs. Paxton testified that Ware had sent "numerous letters" since 1949. Mrs. Paxton could not recall the contents of any of the letters, and she stated that the number received from Ware was "probably" four a month.

Counsel for the Paxtons argues that the Paxtons were poor and uneducated people and that they were therefore more susceptible to the collection methods employed by Ware. Although any collection efforts of a lender would undoubtedly upset most borrowers behind on their debt payments, his position is that Ware's collection efforts toward the Paxtons indicated malice and wantonness in view of their greater susceptibility. However, even taking into account their greater susceptibility, the record here does not reflect that Ware acted with a reckless disregard of the injurious consequences of his acts toward the Paxtons. There is no evidence that Ware carried on a campaign similar to any of the cases previously cited. There is no evidence of telephone calls at all hours of the day and night or the use of abusive language. The record does not show that Ware informed the Paxtons' neighbors, friends, employers, or other creditors that they were behind on their payments or that he even contacted them. There was no attempt to blacklist

the Paxtons with other creditors. There is no evidence of a constant barrage of threatening or insulting letters and telephone calls calculated to harass the Paxtons into paying their debts.

We conclude therefore that there is no evidence to support the jury findings of malice and the trial court's award of exemplary damages.

The judgment of the trial court is therefore affirmed as to the award of $861.66 damages for usury and $15,000 actual damages, but reversed and rendered for petitioner Ware as to the award of $5,000 exemplary damages.