**UNITED FINANCE & THRIFT CORP. et al., Appellants,**

**v.**

**Robert B. SMITH et ux., Appellees.**

**No. 101.**

Court of Civil Appeals of Texas.

Tyler.

Feb. 18, 1965.

Rehearings Denied March 11, 1965.

Hobert Price, Strasburger, Price, Kelton, Miller & Martin, Burt Berry, Irion, Cain, Cocke & Magee, Dallas, for appellants.

Mitchell D. Stevens and Edward C. Fritz, Fritz, Vinson & Stevens, Dallas, for appellees.

DUNAGAN, Chief Justice.

The judgment heretofore entered on January 28, 1965, is set aside and the original opinion is withdrawn. This opinion is substituted for the original.

Plaintiffs, Robert B. Smith and wife, Kanzetta Smith, appellees, brought this action against United Finance & Thrift Corporation of Dallas County, its parent corporation, State Loan & Finance Corporation, and its sister corporation, General Fidelity Life Insurance Company, and also against certain separate loan organizations for double damages for usurious interests charged by each, and also for actual and exemplary damages for unreasonable collection contacts which plaintiffs alleged to be malicious.

Plaintiffs settled with and dismissed the other loan organizations from the suit.

Defendant, United Finance & Thrift Corporation, answered with a general denial; a plea that the plaintiffs knew that if they had a preference as to the company or agent on the credit insurance they could so state and their request could not be ignored; a plea for credit for settlements already made by plaintiffs; a plea that plaintiffs incurred debts which they should have known they would be unable to discharge; failed to seek the advice or treatment of a physician; and a plea that the contacts by the other organizations were the sole proximate cause of plaintiffs' illnesses.

The jury answers to the issues that are pertinent to this appeal are as follows: (3)

United Finance & Thrift Corporation made unreasonable collection efforts against Robert Smith; (4) Such unreasonable collection contacts were actuated by malice; (5) Robert Smith sustained physical pain and mental suffering as a result of such collection efforts; (6) United Finance & Thrift Corporation made unreasonable collection efforts against Kanzetta Smith; (7) United Finance & Thrift Corporation was actuated by malice in making such efforts; (8) Kanzetta Smith sustained physical pain and mental suffering as a result of such unreasonable collection effort; (9) $1,000.00 would fairly compensate Robert Smith for his physical pain and mental suffering as a result of the unreasonable collection efforts of United Finance & Thrift Corporation; (10) $100.00 would reasonably compensate Kanzetta Smith for her physical pain and mental suffering as a result of the unreasonable collection efforts of United Finance & Thrift Corporation; (11) United Finance & Thrift Corporation should pay Robert Smith $3,000.00 as exemplary damages; (12) United Finance & Thrift Corporation should pay Kanzetta Smith $1,500.00 as exemplary damages; (13) And plaintiffs paid United Finance & Thrift Corporation $30.00 after July 2, 1957. (The limitations cut-off date.)

Plaintiffs filed a motion that United Finance & Thrift Corporation had changed its name to American Plan Corporation of Dallas County as testified to by the manager of said company at the trial, and moved that American Plan Corporation of Dallas County be added to the judgment.

The court rendered judgment for plaintiffs against United Finance & Thrift Corporation of Dallas County and its successor, American Plan Corporation of Dallas County, and State Loan & Finance Corporation, jointly and severally, in the following amounts: $60.00 double damages for usury, $1,100.00 actual damages, and $4,500.00 exemplary damages. The judgment included cancellation of the balance upon the final promissory note and costs of court other than those adjudged against the two settling loan organizations.

The trial court ascertained that the $1,500.00 jury verdict for exemplary damages for Kanzetta Smith was excessive to the extent of $1,000.00, and that a remittitur should be required of plaintiffs in the amount of $1,000.00 on or before March 20, 1964.

On March 20, 1964, plaintiffs filed remittitur of the $1,000.00, including therein the following statement: "Plaintiffs expressly reserve the right to an Assignment of Error to the Court of Civil Appeals that said remittitur in whole or in part should not have been required, in the event an appeal is taken by defendants in this cause." On the same day the court overruled defendants' amended motion for a new trial. Defendants duly perfected their appeal.

Appellants have brought forward 33 Points of Error. However, the appellants in their brief say: "Although it has been necessary to set out a large number of Points of Error, it is appellants' primary contention that there is no evidence in this case that the Defendants used unreasonable collection methods or that they were guilty of malice or that Kanzetta Smith suffered any actual or exemplary damages or that Robert B. Smith suffered any actual or exemplary damages.

"Alternatively, it is contended that if there was any evidence to support any of the above mentioned findings, it was insufficient and the verdict of the jury on the issues referred to should be set aside as contrary to the overwhelming preponderance of the evidence.

"Further in the alternative, Appellants will contend in this brief that if any judgment for the Plaintiffs is permitted to stand, this court should require a large remittitur as to the alleged actual damages sustained by Robert B. Smith and also the exemplary damages allegedly sustained by Robert B. Smith." There are no errors assigned to

this court as to the jury findings to Issues 1, 2 and 13.

We will now examine and discuss the evidence to ascertain if it supports the jury findings in this case.

At the trial plaintiffs proved a long series of notes and renewals with United Finance & Thrift Corporation involving various kinds of charges labeled by United Finance & Thrift Corporation as credit insurance, service charges, late charges and interest.

■ During the offering by plaintiffs of their evidence, defendants stipulated that any judgment against United Finance & Thrift Corporation of Dallas County would go also against State Loan & Finance Corporation. Defendants (appellants herein) also admitted complete ownership of General Fidelity Life Insurance Company. Defendants admitted that on more than 99% of its loan transactions, credit insurance was issued on Old Republic Life Insurance Company which in turn paid 85% of the premiums over to General Fidelity Life Insurance Company. Moreover, the manager of United Finance & Thrift Corporation was an agent for Old Republic Life Insurance Company. We think such investment certificate plan of operation used by United Finance & Thrift Corporation was usurious.

Kanzetta Smith testified that she was not able to read any of the papers signed during the loan transactions. United Finance & Thrift Corporation did not advise plaintiffs they could take out insurance with an agent of their own choice, or with a company of their own choice. When she got behind in her payments, a man from United Finance & Thrift Corporation contacted her in the latter part of 1957, coming on her job in a cafe and demanding a payment, to which she explained that her husband was sick and she made only $25.00 a week and couldn't pay the payment, to which the United Finance collector said, "Somebody is going to have to pay." United Finance & Thrift Corporation called her three more times on the job and made personal visits to her house

in the latter part of 1957 and the early part of 1958. United Finance & Thrift Corporation continued to come to their house and demand got "rasher," threatening to take the furniture, threatening to continue to come on her job, and upsetting her.

She further testified that she would cry and the man would continue pressing her after she pleaded with him to leave her husband alone, because each time it would make him much sicker, so the man would take it out on her; Robert was home in bed at that time; she asked them not to contact her on the job but the man threatened to come on the job every day if she didn't pay and to embarrass her so that she couldn't keep a job. She was present at times when additional contacts were made on Robert; they came by the house, talked to them about collecting the money, and at one time they raised their voices. After Robert was sick for two or three weeks, and they had told her they didn't have any insurance, United Finance & Thrift Corporation started coming out to their house at all times of the week and would go in and tell Robert that he would have to make payments and would say, "We can't fool around with you," and each time it would upset Robert and he would begin to get nervous. One time after the collector left, Robert was "rickety" in the bed, could hardly stay in the bed and began to get cold and have a chill; Kanzetta piled cover on him, but he stayed cold; after that, each time they came by it would upset him. United Finance & Thrift Corporation also sent collection letters which upset Kanzetta. After the collector came on Kanzetta's job, her employer sent her word not to come back to work.

Robert Smith testified that around the middle of 1957 he became delinquent and United Finance & Thrift Corporation came out and called and visited him on the job and sent letters, which continued until about the last of 1958; they visited him on every job he ever worked on; the worse contacts were at two service stations; United Finance collectors came out and worried him until he would go and draw some money and

make a payment; the first time Robert was made sick was at one of the service stations where he passed out after one of the contacts. Every time, United Finance collectors told him they wanted some money or they were going to take his furniture.

Robert B. Smith further testified that United Finance & Thrift Corporation also contacted him at a third service station, came out on the job and followed him around there from one end of the building to the other until he got nervous, had a blackout, and his brother-in-law came and carried him home and he stayed in bed about a week. The United Finance collectors said a lot of embarrassing words to him, and he almost had a crying spell there, being unable to help himself; they had to get him out from under a car, carry him home and he had to stay in bed about a week; they came out to his house, sometimes two of them, talking "blustering" talk about what they were going to do; he gave them all the money he had; he was late in his payment because he was sick; and then one of them came out to pick up everything he had; at that time they claimed a balance of $84.00 and he was unable to raise it; he and his wife were both ill; the United Finance man threatened to get a policeman and come back and get the furniture, but did not do so; when asked how he felt after such contacts, Robert said he started to leave home several times, and after he had paid them so many times he got to where he couldn't, he started to leave home; but he knew it was not right to leave his family, so he stayed on and did the best he could; he would have crying spells, headaches and pain, and these spells would come on him on the job and he would have to sit in the car an hour until he got all right.

Robert Smith had been taken to Parkland Hospital several times after these attacks, staying several days. He had not been able to work all the time, and when he was not working he sat around the house and lay down when he got nervous, and had a tiredness coming over him in the chest, back of the neck and head.

When the defendants took Robert Smith's deposition, and asked him what he was complaining of, he answered that the loan company started bothering him and threatening him and got him nervous before he had an attack on his job, and whenever a collector came out and said something to him he would get generally nervous and they would wait near at hand until he got paid and then threaten to take his furniture; he suffered from headaches all the time; he went to a lawyer because United Finance & Thrift Corporation threatened to take his furniture if he didn't renew his loan. He was tired of United Finance & Thrift Corporation bothering him; he could not sleep at night, and they came out and caused him to lose his job at Owens Service Station and went out to his wife's job. He had heavy sweating spells; United Finance & Thrift Corporation did all the arguing and he just listened. Sometimes United Finance & Thrift Corporation would stay on his job an hour at a time, bothering him until he would go and borrow some money to give them; they came to his house "might near every week," sometimes twice a week; a lot of times he would give them all he had; a collector for United Finance & Thrift Corporation cursed him on the telephone after he asked the collector to leave him alone. The United Finance collector said:

"Oh, he said I had better get my so-and-so down there, and I told him I wasn't coming down there."

Robert testified that United Finance & Thrift Corporation sent somebody out there with a truck and they went through the house and looked at all the stuff and asked Robert to sign a paper, which he did not sign. Robert refused to let them have the furniture without the police, and after that:

"A. He cussed at me and I told him to get out and he left.

"Q. He cussed again?

"A. (Witness nods head).

"Q. What did he say?

"A. He say, 'I am going to get this God damned furniture if I have to go get the police to come back' and I said 'that is what you are going to have to do.'"

■ In determining the question of no evidence, the evidence must be viewed in the light most favorable to the verdict. It is the duty of courts to consider only the evidence favorable to the issue. It should disregard all evidence which is adverse, contrary or conflicting to the favorable evidence. Renfro Drug Co. v. Lewis, (Tex.S. Ct., 1950) 149 Tex. 507, 235 S.W.2d 609, 613, 23 A.L.R.2d 1114.

Appellants cite the case of Ware v. Paxton, (Tex.S.Ct., 1962) 359 S.W.2d 897, in which the exemplary damages were deleted from the judgment because of insufficient evidence of malice. But in the Ware case the facts were quite different. The only evidence of collection contacts was a few letters and several phone calls to the borrower over two years, including only one he could remember, a phone call of December 5, 1950, threatening to pick up everything the borrower had, some letters the contents of which were not recalled, and a conversation with the borrower's wife saying he could put the borrower in jail but he didn't want to do it. The Supreme Court stated at page 901 of the decision:

"* * * However, there is no evidence that Ware used abusive or insulting language or anything of that nature in the conversation of December 5, 1950, * * *.

"* * * Mrs. Paxton stated that on that occasion Ware asked where her husband was, what he was doing, and how he could reach him, and that the effect of this was to make her 'real nervous.' She admitted that Ware did not use abusive, vulgar, or indecent language in any conversation with her, nor did he threaten any violence. * *"

In the instant case there is a far longer, more frequent and more malicious course of harassment than in Ware v. Paxton, including threats to get Kanzetta Smith's job, threats to keep calling Robert Smith on his job, and vulgar, abusive language to them.

The case of Wright v. E–Z Finance Co., (Tex.Civ.App., Dallas, 1954) 267 S.W.2d 602, error ref., n. r. e., is one wherein the facts as to harassment in our opinion were far less flagrant than in the instant case as to Robert B. Smith, and yet the verdict was upheld as to both unreasonable collection contacts and malice.

■ After careful review of all of the evidence, insofar as the judgment awards damages to Robert B. Smith, we find it ample to support such award, and the same is not against the great weight and preponderance of the evidence. In re King's Estate, 244 S.W.2d 660.

We have considered all of appellants' points and find no merit in 1 through 9, 19 through 22 and 27 through 30. They are overruled. Riley v. Empire Service Company, (Tex.Civ.App., 1959) 326 S.W.2d 942, writ ref., n. r. e.; Moore v. Savage, (Tex.Civ.App., 1962) 359 S.W.2d 95, writ of err. ref., n. r. e. with per curiam opinion of the Supreme Court, 362 S.W.2d 298; Sutton Motor Company v. Crysel, (Tex.Civ. App., 1956) 289 S.W.2d 631, no writ hist., and Texas Employers' Ins. Ass'n v. Scott, (Tex.Civ.App., 1950) 233 S.W.2d 171, writ ref., n. r. e.

■ However, in our opinion there is no evidence of probative force to support the jury's finding and the judgment awarding damages to Kanzetta Smith. The evidence concerning the collection efforts used by appellants relative to Kanzetta Smith amounted to mental anguish only. This alone is insufficient to sustain a recovery of damages. Duty v. General Finance Company, 273 S.W.2d 64, (Tex.S.Ct., 1954) and Harned v. E-Z Finance Co., 254 S.W.2d 81, (Tex.S.Ct., 1953).

The judgment below, as to Robert B. Smith, is in all things affirmed; as to Kanzetta Smith the judgment of the trial court awarding to her $100.00 for actual damages and $500.00 for exemplary damages is reversed and rendered for appellants and is in all other respects affirmed. Costs of appeal are divided equally between the parties. Rule 448, Texas Rules of Civil Procedure; Woodard v. Tatum, 277 S.W. 2d 943, (Tex.Civ.App., 1955) no writ hist.; Hennemuth v. Weatherford, 278 S.W.2d 271, (Tex.Civ.App., 1955) writ refused, n. r. e.