**ATLAS CHEMICAL INDUSTRIES, INC.,**
Petitioner,

v.

**M. P. ANDERSON,** Respondent.

**No. B–4834.**

Supreme Court of Texas.

April 9, 1975.

June 12, 1975.

Rehearing Denied July 9, 1975.

Strasburger, Price, Kelton, Martin & Unis, Royal H. Brin, Jr., Dallas, Joe Bailey Allen, Kilgore, for petitioner.

Sharp, Ward & Ross, Earl Sharp, Longview, Paul W. Anderson, Marshall, L. F. Burke, Longview, Clark, Thomas, Winters & Shapiro, Mary Joe Carroll, Austin, for respondent.

STEAKLEY, Justice.

A jury awarded M. P. Anderson compensatory and exemplary damages for pollution to his land caused by the industrial discharge of Atlas Chemical Industries, Inc. The Court of Civil Appeals reduced the amount of compensatory damages and affirmed. 514 S.W.2d 309. We affirm the reduced award of compensatory damages but reverse and render with respect to the award of exemplary damages.

M. P. Anderson instituted this suit in June of 1968. He initially alleged that Atlas intentionally and continuously polluted Darco, Coldwater and Potter's Creeks causing damages to his land; and that such acts of Atlas were willful and called for an award of exemplary damages. In 1970, Anderson amended his petition to seek damages for pollution occurring within the two years prior to institution of the suit. At the conclusion of the evidence, the court allowed Anderson a trial amendment seeking recovery on the basis of allegations of negligence.

The principal problem as the case reaches us is the application of the two year Statute of Limitations, Art. 5526, § 1.[1] In resolving this, as well as the other questions presented in the appeal under established precedents, we do not reach, and

1. The reference is to Vernon's Tex.Rev.Civ. Stat.Ann.

express no opinion on, other considerations upon which the Court of Civil Appeals wrote at some length:

In answers to Special Issues, the jury found that Atlas discharged excessive quantities of polluted effluent into Darco and Potter's Creeks after July 1, 1966; that said discharge was the producing cause of the damage to Anderson's land; that Atlas was negligent in so doing which was proximate cause of the damage; that Atlas failed to provide proper purification equipment or construct settling basins after July 1, 1966, which was negligence and proximate cause; that the damage to Anderson's property was temporary in nature; that sixty acres of Anderson's land had decreased $10,500 in market value; that the restoration cost of the land was $45,000; that the loss of the use of the land between 1964 and 1966 was $1,500, and between 1966 and 1968 was $2,500; that Atlas acted "willfully" in polluting Anderson's land for which he is entitled to exemplary damages in the amount of $25,000.

The trial court judgment for Anderson was in the sum of $61,375.[2] The Court of Civil Appeals reformed this judgment so as to award Anderson actual damages in the sum of $10,500 and exemplary damages in the sum of $25,000.

As indicated, the point of error of major concern urged by Atlas is that the lower court erred in holding that the cause of action asserted by Anderson was not barred by Article 5526 that prescribes a limitations period of two years for the commencement and prosecution of an accrued cause of action for injury done to the property of another. The facts as to this will be briefly stated.

In 1922, Atlas commenced the operation of a plant in Marshall, Texas, for the purpose of manufacturing activated carbon, a purifying agent used extensively in industry. The around-the-clock process consisted of heating lignite, a species of bituminous coal, in rotary kilns and washing it down with a hydrochloric and sulphuric acid solution. The resulting dark washwater of acid, fly ash, carbon and lignite particles was discharged as waste into Darco Creek, a tributary of Coldwater Creek which in turn runs into Potter's Creek. The three streams converge on a tract of 185 acres acquired by Anderson in 1964 by gift from his father, Paul W. Anderson. The resulting deposit of the carbon washwater on sixty acres of the tract represents the damage claim of Anderson.

Since 1961, Atlas has been under the jurisdiction of the Texas Water Quality Control Board and was issued an industrial discharge permit in May 1963, setting out the maximum water pollution allowable. In conjunction with and as a condition of the 1963 permit, Atlas began a process whereby the acidity of the washwater would be reduced and the suspended solids—fly ash, carbon and lignite—would be eliminated. Neutralization of the acid was to be of top priority and to that end calcium hydroxide, lime, was added to the washwater sometime in 1964 or 1965. Although this procedure had a neutralizing effect on the acid content, it blackened the washwater even more and increased the amount of suspended solids. As a result of the failure or inability of Atlas to meet the permit requirements, Atlas and the Texas Water Quality Board had several meetings in 1966 and 1967 that resulted in an increase in efforts to reduce the acidic content of the effluent. This had not been entirely successful by the time of trial in 1970.

2. The trial court made additional findings in the judgment and reduced the damages as found by the jury.

Prior to submission of the case to the jury, and over the objection of Atlas, Anderson was permitted to file a trial amendment alleging negligence and recovery on the basis of these allegations was embodied in the issues submitted to the jury. We overrule the contention of Atlas that the trial court abused its discretion in allowing the trial amendment. There was substantial testimony offered without objection pertaining to the duty of Atlas to minimize the pollution in the washwater and its failure to do so. Further, Atlas offered detailed testimony concerning the complexities involved in purifying the effluent, the difficulty of the problems with which it was confronted, together with its diligence in seeking a solution. In our view, Atlas was not prejudiced in maintaining its defense upon the merits of the case by the action of the trial court in allowing the trial amendment. Cf. Moulton v. Alamo Ambulance Service, Inc., 414 S. W.2d 444 (Tex.1967). Texas Employers' Ins. Ass'n v. Dillingham, 262 S.W.2d 748 (Tex.Civ.App.1953, writ ref'd, n. r. e.) cited by Altas is not in point; there the party asserting prejudice had objected during trial to the evidence in question as without basis in the pleadings.

So we reach the question of whether Anderson's asserted cause of action in negligence was barred by the two year Statute of Limitations, and this is determined by whether the injury for which he sought damages was permanent or temporary.

The question of the temporary or permanent character of injury to land was initially conceived as an aspect of damages. At common law, a plaintiff suing for a continuing invasion of his land could recover for only those damages accrued by the time' of trial. Uline v. New York Cent. & H. R. R. Co., 101 N.Y. 98, 4 N.E. 536 (1886). To relieve the burden placed upon an aggrieved landowner to bring successive suits, the courts developed the concept of permanent injury to permit the recovery of past and future damages. Town of Troy v. Cheshire R. Co., 23 N.H. 83, 55 Am.Dec. 177 (1851); McCormick on Damages § 127, at 505. Coactive with the advantage of a future damage award was the disadvantage of bringing the action within the limitation period as measured from the first injury; i. e., the cause of action accrued for limitations purposes at the time of the first actionable injury. As Professor McCormick stated, "the plaintiff, who ought certainly to be given a continuing possibility of redress against a continuing wrong, finds himself blocked by a plea of limitations based on the claim that the only cause. of action arose when the nuisance was first established." McCormick on Damages, § 127, at 513. See Prosser, Handbook on the Law of Torts, § 13 at 75 (4th Ed. 1971). Missouri-Pacific Ry. Co. v. Davis, 186 Ark. 401, 53 S.W.2d 851 (1932); Schlosser v. Sanitary Dist. of Chicago, 299 Ill. 77, 132 N.E. 291 (1921); McDaniel v. City of Cherryvale, 91 Kan. 40, 136 P. 899 (1913); 21 Ill.L.Rev. 629 (1927); 27 Ill.L.Rev. 953 (1933); 21 Minn.L.Rev. 334 (1936).

In Texas, it is settled that an action for permanent damages to land accrues for limitations purposes upon the first actionable injury. Tennessee Gas Transmission Co. v. Fromme, 153 Tex. 352, 269 S.W.2d 336 (1954); City of Athens v. Evans, 63 S.W.2d 379 (Tex.Com.App.1933, holding approved). Permanent damages result from an activity which is "of such a character and existing under such circumstances that it will be presumed to continue indefinitely"; "the injury must be constant and continuous, not occasional, intermittent or recurrent." 58 Am.Jur.2d, Nuisance § 117 at 683. In Tennessee Gas Transmission Co. v. Fromme, *supra,* we held that the damage resulting from a continuous flow of polluted water on the plaintiff's land for four years was permanent, as a

matter of law, and that the cause of action for damages therefrom arose at its beginning. Likewise, in Vann v. Bowie Sewerage Co., 127 Tex. 97, 90 S.W.2d 561 (1936), the court stated the facts as showing conclusively that water in a polluted condition had been continually discharged since a septic tank had been placed in operation many years before; that the polluted water had found its way upon the land in question; and that the damage caused thereby was permanent.

Temporary damages, however, have been found where the injury is not continuous but is sporadic and contingent upon some irregular force such as rain, Baker v. City of Fort Worth, 146 Tex. 600, 210 S.W.2d 564 (1948); Austin & N. W. Ry. Co. v. Anderson, 79 Tex. 427, 15 S.W. 484 (1891), and wind, Youngblood's Inc. v. Goebel, 404 S.W.2d 617 (Tex.Civ.App.1966, writ ref'd, n. r. e.). An explication of the type of circumstance that gives rise to a finding of temporary damage, and the result of such a finding on the limitations defense, was written in Austin & N. W. Ry. Co. v. Anderson, *supra*:

. . . We conclude from the authorities that, where a nuisance is permanent and continuing, the damages resulting from it should all be estimated in one suit, but where it is not permanent, but depends on accidents and contingencies so that it is of a transient character, successive actions may be brought for injury as it occurs; *and that an action for such injury would not be barred by the statute of limitations, unless the full period of the statute had run against the special injury before suit.* (Emphasis added.)

Accordingly, limitations commences in such instances at the time the special injury became actionable.

In the case at bar, the jury found that Atlas discharged excessive quantities of polluted effluent into the creek waters after 1966, and that the property damage in question was temporary in nature. Atlas attacks these findings as without any support in the evidence; it urges that there has been continuous pollution and consequent damage to Anderson's land from the inception of plant operations in 1922; that the damage was permanent, as a matter of law; and that the cause of action arose at the first injury long years ago. Atlas cites as in point Tennessee Gas Transmission Co. v. Fromme, *supra,* in which it was stated:

A careful reading of respondent's pleadings and the evidence introduced in the case conclusively reveals that respondent's legal rights were invaded the moment water from the petitioner's plant began to flow upon her land. Water was wrongfully discharged from petitioner's plant onto respondent's land as early as February, 1948, and continuously flowed thereon until it was diverted by acts of petitioner some time in September, 1950. Respondent's cause of action accrued at the time petitioner began wrongfully discharging the water on the land, and not on the date when the extent of the damages to the land were fully ascertainable.

In invoking the *Fromme* rationale, Atlas argues that the only change in the discharge in the recent past occurred when lime was added to the effluent to neutralize the acid in 1964 and that even if this change could be the basis of a new cause of action, it arose four years prior to the suit and is barred.

We disagree and hold there was evidence to support the findings of temporary damage. Paul Anderson, M. P. Anderson's

father, testified in effect that prior to 1967 damage to the sixty acres in question had not been constant and that at the most only a four-acre area around the creek could be said to have been continuously affected by the polluted effluent.[3]

We recognize that this and the other evidence is not very satisfactory with respect to the times and nature of unusual flooding conditions; but viewing the evidence as a whole, it can be said that the flooding from a normal rain would not overflow and cover the sixty acres in question, whereas a three or four inch rainfall would; that the winter rains are generally the cause of the flooding; that the creeks did overflow and cover the sixty acres in 1968, as they had at times in the past; that an abnormally dense accumulation of the black lignite sediment, at some points ten inches in depth, occurred in the winter of 1967 and 1968, prior to which time the damage was principally to the creek and creekbed; and that the damaging deposits were greater and different from prior years.

In addition, testimony was elicited from Mr. Van Reenen and Mr. Briggs, the plant managers at Atlas for the relevant time periods, that Atlas began using lime to neutralize the acid in 1964 and 1965; that

the lime increased the solid content of the effluent; and that in 1966 they intensified their neutralization in order to bring the acidic content of the effluent under control. Mr. Whittington, acting director of Field Operations Division of the Texas Water Quality Board testified that the maximum amount of suspended solids as set by the Board was 30 parts per million, that in August 1966, tests showed the effluent had 8410 parts per million, that in March of 1968, there were 1445 parts per million and that in September 1969, there were 449 parts per million.

These are circumstances that call for application of the rule stated by this Court in Rosenthal v. Taylor, 79 Tex. 325, 15 S.W. 268 (1891), under which it is doubtful, at the least, that Anderson could have recovered for his whole and future damage had he sought to do so. This Court there said:

. . . The controlling rule in actions for injuries resulting from similar nuisances would seem to be to adopt in each case that measure of damages which is calculated to ascertain in the most certain and satisfactory manner the compensation to which the plaintiff is entitled. When the injury is liable to occur only at long intervals, or when the nui-

---

3. Q. For purposes of the record, it is difficult to introduce this as an exhibit, can you describe the color of it?

A. I'd say it's coal black, such as lignite or coal.

Q. Is it a solid?

A. This is a solid.

Q. And, over what portion of your meadowland did this material cover or is it found?

A. The entire sixty acres was covered to some degree, but it is in varying degrees, it's not ten inches all over it, and it's not one inch all over it, but it is found in sufficient quantities to restrict and in some areas prohibit the growth of grass.

Q. Now, did that condition exist to any appreciable degree on this sixty-acre tract prior to 1967?

A. Only as I before stated on about four acres.

Q. Was there some of that on the four acres?

A. Not very much.

Q. All right, Now what do you see in there with reference to the damage to the land?

A. I see this black carbonaceous, lignite, Darco, whatever it is.

Q. Did that condition exist on that land prior to 1966?

A. No. It was in the stream, the creek, but not on the land.

sance is likely to be removed by any agency, the damages which have accrued only up to the time of the action will be allowed; but if the nuisance is permanent, and the injury constantly and regularly recurs, then the whole damage may be recovered at once.

This crucial element of permanence and continuity in the classification of damages for which a cause of action arises at inception, see also Austin & N. W. Ry. Co. v. Anderson, *supra*, distinguishes *Fromme, supra,* where it was expressly stated that the cause of the injury there, i. e., the water discharge from the plant, "continuously flowed" onto the land in question.

The trial court awarded Anderson total damages, actual and exemplary, in the sum of $61,375 for the period of two years prior to the filing of suit. The Court of Civil Appeals reformed this judgment so as to reduce the award of actual damages to the sum of $10,500. The actual damage award of $10,500 was held to represent the correct measure in the case, i. e., the diminution in the fair market value of the land found by the jury to be $175 per acre for sixty acres. The jury found the value of the sixty acres before July 1, 1966 to be $225 per acre and that its value was $50 per acre on or about December 1, 1969.

Atlas does not here attack the measure of the actual damages as improper; its point of error is that there is no evidence of probative force to establish the value of the damaged land at $225 per acre immediately before July 1, 1966. It is argued as to this that the appraisal witness presented by Anderson testified that the highest value of the entire tract, of which the sixty acres is a part, was $200 per acre. However, there was appraisal evidence that the sixty acres claimed to be specially damaged

by the deposits left after intermittent floodings was more valuable as bottom land and had a value of from $250 to $300 an acre in an undamaged condition. The jury finding in question related to this sixty acres and, as previously indicated, the testimony of Anderson, Sr., was that the pre-1966 pollution was "in the stream, the creek, but not on the land." There was factual basis for the jury finding in question that the sixty acres found by the jury to have been damaged by deposits of lignite and waste after July 1, 1966 had a cash market value of $225 prior to such time.

We agree with Atlas, however, in its points of error attacking the award of exemplary damages in the sum of $25,000 that was affirmed by the Court of Civil Appeals. The jury was asked to find if Atlas acted willfully toward Anderson by the pollution of the creek waters subsequent to July 1, 1966. The jury was instructed that the fact that an act is unlawful is not of itself ground for an award of exemplary damages, but it must be of a willful nature; and that by the term "willfully" is meant the intentional and purposeful disregard of the known rights of another.

Negligence or the want of ordinary care will not expose the actor to exemplary damages. Bennett v. Howard, 141 Tex. 101, 170 S.W.2d 709 (1943); Missouri Pac. Ry. Co. v. Shuford, 72 Tex. 165, 10 S.W. 408 (1888). Nor does a mere unlawful act suffice. Ogle v. Craig, 464 S.W.2d 95 (Tex.1971); Dennis v. Dial Finance & Thrift Co., 401 S.W.2d 803 (Tex.1966); Ware v. Paxton, 359 S.W.2d 897 (Tex. 1962); Jones v. Ross, 141 Tex. 415, 173 S. W.2d 1022 (1943). Instead, it is settled that there must be a showing of "gross negligence" in order to obtain exemplary damages in a negligence case. Sheffield

Division, Armco Steel Corp. v. Jones, 376 S.W.2d 825 (Tex.1964). Gross negligence as defined in *Shuford, supra,* has been frequently cited:

> Gross negligence, to be the ground for exemplary damages, should be that *entire want of care* which would raise the belief that the act or omission complained of was the result of a *conscious indifference* to the right or welfare of the person or persons to be affected by it. (Emphasis added.)

We will assume, without approving, that the definition of "willfully" in the charge to the jury as an intentional and purposeful disregard of the known rights of others comports in effect with the gross negligence requirement of *Shuford, supra,* that Atlas acted with such an entire want of care as to constitute a conscious indifference to the rights of Anderson. We agree with Atlas, however, that there is no support in the evidence for the findings of the jury to such effect. The activities of Atlas were of course intentional as a part of its manufacture of industrial carbon. But there were efforts on its part to reduce the harmful quality of the effluents by accepted control devices, and to reduce and eventually eliminate the suspended solids. Atlas was under the jurisdiction of the Texas Water Quality Control Board during the period in question and had altered its procedures to neutralize the harmful acid as required under its permit. As before stated, it was also shown that from August 1966 until September 1969, Atlas had reduced the amount of suspended solids from 8410 parts per million to 449 parts per million. The fact that Atlas was not immediately successful in eliminating the harmful elements in the washwater, or that it could have done more than it did under the circumstances, does not constitute gross negligence as required for the assessment of punitive damages.

The judgment of the Court of Civil Appeals reforming the judgment of the trial court so as to award M. P. Anderson the sum of $10,500 for actual damages is affirmed; but its judgment awarding Anderson the further sum of $25,000 for exemplary damages is reversed and judgment is here rendered that Anderson take nothing as to this. Costs will be assessed one-half to each of the parties.

## ON MOTION FOR REHEARING

### PER CURIAM.

On rehearing and reconsideration of the record, we have determined that there is evidence to support the jury finding of willful, i. e., intentional and purposeful, disregard of the rights of others and to support the award of exemplary damages.

■ Atlas, through its responsible agents, knew that the plant was discharging large quantities of black sediment into Potter's Creek. It chose to operate the plant and continue that discharge. At some point and under all the circumstances, the failure to make any correction to save downstream property owners from damage finally warrants a decision by the trier of fact that the managerial decision for this operation was made wholly without regard, and with conscious indifference, to the rights of the property owners.

In 1963 Atlas obtained a permit from the Texas Water Quality Board to discharge waste. The Board held a hearing in August of 1966 to consider the failure of Atlas to comply with the limits of suspended solids allowable in its permit. In January of 1967 the permit was amended and Atlas was given one year in which to comply with the Board's requirements. When this case was tried in

1970 Board requirements had never been met. Instead, there is evidence that the discharge of black lignite sediment was greater in 1967 and 1968 than at any time.

In 1968 an Atlas engineer reported to the Board on operations and plans with regard to permit compliance, and the Director of Central Operations for the Board wrote a letter in response which included this paragraph:

> We appreciate the fact that you have difficult problems to solve. However, we note from past reports that these problems were recognized in 1958 and by 1960, designs were being drawn up and submitted with similar reports. Over this period of years (1960–1968) there have been no apparent additional facilities for waste treatment at the Marshall plant. We are concerned that the results obtained to date are not commensurate with the eminence of your research staff.

Another hearing was held by the Board on this matter in November of 1969, at which time the Board Chairman told the Atlas people: "We don't want any more shilly-shallying."

Conceivably the pollution of Potter's Creek could have continued despite efforts to correct it which, though not meeting the standard of reasonableness, would have demonstrated that Atlas acted with at least some concern for the consequences to downstream property owners. If efforts were made, this record is silent about them. For years Atlas was in violation of its state permit and doing harm to the public waters and the property of others. Atlas shows no explanation or justification and apparently did nothing of any significance to meet the problem.

The jury was entitled to conclude that Atlas made the business decision to continue the discharge of its waste and did so with conscious indifference to the rights of others. Therefore we have a proper basis for an award to this plaintiff of exemplary damages.

The motion for rehearing of M. P. Anderson is granted; the motion for rehearing of Atlas Chemical Industries, Inc. is overruled. The judgment of this Court of April 9, 1975, is set aside. The judgment of the Court of Civil Appeals is affirmed.

STEAKLEY and DENTON, Associate Justices, note their dissent.