In The
Court of Appeals
For The
First District of Texas
____________
NO. 01-02-00461-CV
____________
 
CHARLOTTE ANN KAECHELE MIETH; BONNIE REZNICEK, AGENT
AND ATTORNEY-IN-FACT FOR ROYCE MARIE KAECHELE; BONNIE
JEAN KAECHELE REZNICEK; BONNIE JEAN KAECHELE REZNICEK,
SUCCESSOR TRUSTEE OF THE CHARLES KAECHELE TRUST FOR
ROYCE M. KAECHELE AND SUCCESSOR TRUSTEE OF THE CLARA
KAECHELE TRUST FOR ROYCE M. KAECHELE, APPELLANTS
 
V.
 
RANCHQUEST, INC.; TEXICAL ENERGY CORPORATION D/B/A
TEXICAL, INC.; AMCAS, INC.; ROBERT HUCKABY; PENSOR
PRODUCTION COMPANY; ROBERT LEON; AND
TEX-ATIC RESOURCES, INC., APPELLEES
 

 
 
On Appeal from the 155th District Court
Austin County, Texas
Trial Court Cause No. 97V095
 

 
 
OPINION ON FURTHER REHEARING
          We grant appellee’s motion for further rehearing, withdraw our opinion issued
May 20, 2004, and issue this opinion in its place. 
          In October 1997, appellants sued appellees to recover damages caused to their
surface estate by appellees’ operations at and re-entry of an abandoned oil and gas
well. The case was tried to a jury in 2001, and the jury found that Texical Energy
Corporation d/b/a Texical, Inc. (Texical) was 100% liable for negligence proximately
causing injury to appellants’ property. The jury awarded $200,000 as reasonable
costs to repair appellants’ property, $10,000 in exemplary damages, and $88,000 in
attorney’s fees, but found no diminution in the value of appellants’ property. The
trial court concluded that the injury to the property was permanent and, therefore, that
the correct measure of damages was the diminution in value to the land. Because the
jury found no diminution in value, the trial court rendered judgment for appellees. 
We affirm. 
I. Background
A.      The Lease Operation
          Appellants own the surface of a 973-acre tract of grazing land in Austin
County, Texas. Appellants referred to this tract, purchased in 1952 by Charles
Kaechele, appellants’ deceased father, as the “Best” tract. In 1992, appellants and
the owners of the mineral estate executed an oil and gas lease to appellee Ranchquest,
Inc. (Ranchquest). Sometime before March 16, 1996, drilling operations were begun
on the well known as Best No. 2 well, which was located on the northern 300+ acres
of the 973-acre tract.
          Robert Leon and Robert Huckaby, the individual appellees, owned or
controlled a group of corporations, including appellees Ranchquest, Texical, Tex-Atic
Resources, Inc. (Tex-Atic), and Amcas, Inc. (Amcas). Ranchquest acquired oil and
gas leases, and Texical operated the oil and gas wells on those leases. At the time of
trial, Leon and Huckaby used Tex-Atic to operate oil and gas wells on the leases
acquired by Ranchquest. Leon and Huckaby used Amcas as the repository for
investors’ funds to be used in drilling, completing, equipping, and operating oil and
gas wells drilled on behalf of Texical or Tex-Atic on leases acquired by Ranchquest. 
Appellee Pensor Production Company (Pensor) is a drilling contractor.
          In July 1996, Pensor entered into a contract with American Cascade Energy,
Inc., Texical’s predecessor, to provide the rig and crew that would take over the
drilling on the Best No. 2 well. In August 1997, Pensor’s contract was amended to
add the Best No. 3 well. Appellees continued operations on the Best No. 2 well
through the remainder of 1996 and into 1997. Appellees did not construct reserve
pits or a ring levee around the Best No. 2 well surface location until after March
1997. As a result, the drilling operations discharged drilling fluids, diesel fuel, oil,
and saltwater onto appellants’ pasture and raw sewage into open pits. Although
appellees decided to construct a reserve pit for the Best No. 2 well in 1997, they never
closed it. The Best No. 2 well produced for a few days in December 1997 and
January 1998, but was no longer producing at the time of trial.
          In August 1998, appellees began working on the Best No. 3 well, also located
on the northern 300+ acres of the tract. Although a reserve pit and a ring levee were
constructed for the Best No. 3 well, appellees pumped fluids out of the pit and into
a ditch that had been dug to run fluids into a nearby creek.
B.      Texas Railroad Commission Reports
          During trial, the trial court admitted the Railroad Commission (the
Commission) reports on the Best Nos. 2 and 3 wells into evidence. The Commission
inspected the operations and conditions maintained on the Best No. 2 well location
24 times, and cited the Best No. 2 well on almost every inspection for violating
Railroad Commission Statewide Rule 8 (Rule 8).


 On March 3, 1999, the
Commission issued a report containing findings of fact regarding alleged violations
committed at the Best No. 2 well. The report notes that the Commission conducted
inspections from December 18, 1996 through August 28, 1998. The Commission
found that the operator had caused or allowed the discharge of 20 to 30 gallons of
lubricating oil from machinery.


 The Commission also found overflowing mud tanks
combined with rain wash-off from the rig affecting an area approximately 100 by 150
feet on the west side of the rig. In addition, other oil discharges from around the
diesel motors had flowed from a 70-by-8-foot pit into an adjacent pasture. The
Commission noted that, by January 23, 1997, the affected area had increased in size
to approximately 300 by 500 feet and that the inspectors had observed an oil and
diesel sheen.


 The report noted that the operator was also using the reserve pit for
disposal of raw sewage from a trailer house and that recent rainwater had caused the
pit to overflow.
          The Commission’s report on the Best No. 3 well showed that, in August 1998,
appellees began work on this well. Before commencing drilling operations, appellees
constructed a reserve pit and a ring levee at the Best No. 3 well location. However,
appellees pumped fluids out of the reserve pit and into a ditch that had been dug to
run the fluids into the East Little San Bernard Creek. The Commission made 22
inspection visits to the Best No. 3 well location and found numerous violations of
Rule 8. Unlike the Commission’s factual findings on the Best No. 2 well, the
Commission’s findings of fact on the Best No. 3 well were not included in the record. 
As of the time of trial, the reserve pit on the Best No. 3 well location was still open. 
C.      Testimony
          1.       Frank Roberts, Jr.
          At trial, Frank Roberts, Jr., a consultant for appellees, testified that the site
around the Best No. 3 well was cleaned up during the summer of 1999 and was left
in as good a shape as it could have been after a drilling completion. The reserve pits
on the Best Nos. 2 and 3 well sites were still in existence and were then open because
appellants had threatened the contractor and told him not to close the sites. The
black, cracked, thick substance shown in photographs taken by appellants in February
1999 was simply a mixture of graphite and glycerin used in conjunction with mud to
get the pipe to slide free. This mixture, which was regularly used in these types of
drilling operations, was non-toxic and could easily be disposed of. Pensor took over
the drilling operations on the Best No. 2 well in July 1996, but did not construct a
ring levee and reserve pit until early 1997. The drilling operations ended sometime
in early June 1997.
          Roberts, who was working with Texical on the Best No. 3 well at the time,
arrived at the site shortly after the Commission had inspected the Best No. 3 well. 
The inspection revealed that the reserve pit had overflowed and had reached the road
drainage, discharging into the creek at a rate of one gallon per minute. The inspector
noted that drilling fluid had overflowed the reserve pit embankment, affecting an area
of approximately 20 by 30 feet. Because there was no sewage septic tank, all sewage
was discharged into earthen pits. Roberts agreed to remediate the soil contaminated
by the drilling fluid, which he did a few days later. 
          Roberts further testified about the following inspections: 
          •        January 26, 1999: there were no additional violations, but the drilling-fluid residue coating the bottom of the ditch still remained and needed
to be cleaned. 
 
          •        February 3, 1999: the drainage ditch going into the creek had not been
cleaned up and was backing up with water.
 
          •        February 29, 1999: Roberts agreed to have the drilling fluids in the ditch
cleaned up.
 
          •        March 3, 1999: about five gallons of oil were on the ground where the
drilling rig motors had been.
 
          •        June 21, 1999: the north pit contained chloride levels of 450 parts per
million (ppm) and a film of oil covered 20% of the pit; the south pit
contained a chloride level of 35,800 ppm and no oil.
 
          •        August 3, 1999: both pits remained open, both had a skim of oil on
them, and the south pit contained saltwater chlorides of 35,000 ppm.
 
          •        Subsequent inspections revealed that heavy rains had resulted in more
saltwater inside the pits. Roberts said that, when a pit is dewatered, it
leaves behind some chlorides and that the chloride content is likely to
rise when mixed with rainwater. 
 
          2.       Michael Swetish
          Appellants’ expert, environmental scientist Michael Swetish, testified that, in
his opinion, both sites were heavily impacted by salt. Many of the pits remained
open; the pits had high salt levels in them; the salt extended beyond the pit
boundaries; and oil and hydrocarbons remained in the pits. In his opinion, the sites
were in need of remediation because the contaminants that remained on the sites were
elevated to levels that would impact the landowners’ property if not corrected. 
Should the contaminated soil not be decontaminated, the contaminants would, over
time, seep into the soil deeply enough to contaminate the underground water sources.
          Swetish testified that, if a pit contained high levels of contamination, the
contaminated material could be removed and taken to a treatment facility and the pit
could be backfilled with clean material. Swetish collected soil samples and
conducted three soil surveys, at depths of from 3 to 18 feet, which revealed high
levels of chlorides in the drill material, ranging from 108,000 to 57,000 ppm on the
Best No. 2 well and from 48,000 to 47,000 ppm on the Best No. 3 well. Swetish
concluded that the sites were contaminated with salt levels sufficient to restrict
vegetative growth and to disperse salt into the surrounding environment, not only by
spreading laterally, but, with time, by moving more deeply into the ground,
potentially impacting deeper zones of soil and ground water. Swetish estimated that
the remediation, which would include excavating, transporting, and disposing of the
contaminated material and replacing that material with clean fill, would cost
$288,000. On cross-examination, Swetish testified that the remediation plan that he
suggested covered a total of four acres and that he had not conducted any ground-water studies to support his conclusion that the existing conditions, if left unrepaired,
would result in ground-water contamination.
          3.       Frank Reznicek
          Frank Reznicek, the husband of appellant Bonnie Reznicek, had worked on the
Kaechele ranch since 1980. At the time of trial, he was the ranch manager
responsible for planning and overseeing the day-to-day activities at the ranch. He
testified that the defendants had polluted the property with diesel oil and salt water
and that the chlorides about which the appellants were complaining were present on
the property at all times and did not come and go with the rain. He also testified that
the contamination had been basically the same since 1996.
          4.       Robert Moorman
          Robert Moorman, a real estate appraiser and appellees’ expert witness, testified
that he was able to form an opinion of the current fair market value of the Best tract
after inspecting the property and researching comparable sales. In his opinion, the
market value of the Best tract was $750 per acre, a total of $730,000. He testified
that, if the four acres were contaminated, the maximum diminution in value of
appellant’s property would be $3,000.
          5.       William Haley
          William Haley, appellants’ real estate appraisal expert, testified that he used the
sales-comparison approach in determining the fair market value of appellants’
property. He testified that this approach compares the property being appraised to
similar properties that have been sold in the area, taking into account any particular
features that could raise or lower the value of the property. He concluded that the fair
market value of appellants’ property was $730,000 before the contamination and
$430,000 after the contamination. His basis for the $300,000 diminution in value was
the cost to remediate, plus management costs or administrative costs typically
incurred by the owner in decontaminating the property. 
II. Analysis
A.      Temporary or Permanent Injury
          In their first issue, appellants contend that the trial court erred in determining
that the damage to their property was permanent, rather than temporary.
          Permanent damage results from activity that is of such a character and that
exists under such circumstances “that it will be presumed to continue indefinitely.” 
Bayouth v. Lion Oil Co., 671 S.W.2d 867, 868 (Tex. 1984). Permanent injuries are
those that are “constant and continuous, not intermittent or recurrent.” Atlas Chem.
Indus., Inc. v. Anderson, 524 S.W.2d 681, 685 (Tex. 1975), overruled on other
grounds, Burk Royalty Co. v. Walls, 616 S.W.2d 911, 922 (Tex. 1981). When the turf
or sod is so injured as to make the land less productive in the future, the injury is
permanent, even though it may not be perpetual. See Ft. Worth & N.O.R. Co. v.
Wallace, 12 S.W. 227, 228 (Tex. 1889). The proper measure of damages for
permanent injury to the land is the diminution in the value of the land. Kraft v.
Langford, 565 S.W.2d 223, 227 (Tex. 1978).
          Temporary injuries are intermittent, sporadic, or recurrent injuries to land that
are contingent upon some irregular force, such as rain. Bayouth, 671 S.W.2d at 868. 
When an injury to land is temporary and can be remediated at reasonable expense, the
proper measure of damages is the cost of restoration to its condition immediately
preceding the injury. Kraft, 565 S.W.2d at 227. However, the diminution in fair
market value is the measure of damages when the cost of restoration exceeds the
diminution in fair market value. North Ridge Corp. v. Walraven, 957 S.W.2d 116,
119 (Tex. App.—Eastland 1997, pet. denied) (citing Atlas Chem. Indus., Inc. v.
Anderson, 514 S.W.2d 309 (Tex. Civ. App.—Texarkana 1974), aff’d, 524 S.W.2d
681 (Tex. 1975)). 
          In this case, the evidence showed that the ground was so injured as to impair
the productivity of the soil and that the injury had been constant since 1996. 
Therefore, the trial court did not err in determining that the damage to the tract of land
was permanent. 
          We overrule appellants’ first issue. 
B.      Comment on the Weight of the Evidence
          In their second issue, appellants contend that the trial court erred in
commenting on the weight of the evidence. A comment on the weight of the evidence
is a comment by the trial court, usually in the jury charge, that suggests the trial
court’s opinion concerning an issue in the case. Maddox v. Denka Chem. Corp., 930
S.W.2d 668, 671 (Tex. App.—Houston [1st Dist.] 1996, no writ); see also Tex. R.
Civ. P. 277 (“The court shall not in its charge comment directly on the weight of the
evidence or advise the jury of the effect of their answers . . . .”). Appellants’
complaint involves statements made by the trial court in discussions with the
attorneys out of the presence of the jury. We decline to review such statements as
comments on the weight of the evidence. 
          Under this same issue, appellants refer to “a ‘judicial misconduct’ complaint.” 
They specifically complain about the trial court’s statement, “[I]f [the injury] is
temporary, how much it costs to remediate, which under some situations the court
could take the position that $288,000 is excessive; therefore, I bypass that measure
and go to diminished value.” Appellants claim that the trial court “intended from the
beginning to award minimal damages irrespective of what the evidence
demonstrated.” 
          We first note that appellants have not preserved any error regarding comments
the trial court made. Moreover, we interpret the trial court’s statement to be a
recognition that the measure of damages to land, when the cost of remediation
exceeds the diminution in fair market value, is the diminution in fair market value. 
See North Ridge Corp., 957 S.W.2d at 119. 
          We overrule appellants’ second issue.
C.      Unsolicited Offer to Purchase
          In their third issue, appellants contend that the trial court erred in allowing the
introduction of Amcas’s unsolicited and unaccepted offer to purchase the Best tract
as evidence of market value of their property because that offer constituted an
inadmissible offer of settlement. Appellants claim that the appellees used the
unaccepted offer to purchase to argue that there was no diminution in value to the
Best tract. 
          Amcas offered, in writing, to purchase appellants’ property for $730,000,
which was, according to Swetish, the estimated fair market value of the property
before the injury. The offer, which the trial court admitted into evidence, stated,
“This letter is not an offer of settlement and is not intended in that manner.” 
Appellants did not accept the offer.
          Texas Rule of Evidence 408 states, “Evidence of (1) furnishing or offering or
promising to furnish or (2) accepting or offering or promising to accept, a valuable
consideration in compromising or attempting to compromise a claim which was
disputed as to either validity or amount is not admissible to prove liability for or
invalidity of the claim or its amount.” Tex. R. Evid. 408. 
          Amcas’s offer to purchase the property stated specifically that it was not a
settlement offer and did not ask appellants to compromise their claim in any way. See
Tatum v. Progressive Polymers, Inc., 881 S.W.2d 835, 837 (Tex. App.—Tyler 1994,
no writ).
          We hold that the unaccepted offer to purchase was not a settlement offer. 
Accordingly, we overrule appellants’ third issue. 
D.      Negligence Per Se
          In their fourth issue, appellants contend that the trial court erred in refusing to
submit their requested instruction on negligence per se because the evidence
established Texical’s repeated violations of Rule 8.
          Negligence per se is a concept in which a legislatively imposed standard of
conduct is adopted by the civil courts as defining the conduct of a reasonable and
prudent person. Carter v. William Sommerville & Son, Inc., 584 S.W.2d 274, 278
(Tex. 1979). In such a case, the jury is not asked to decide whether the defendant
acted as a reasonable, prudent person would have acted under the same or similar
circumstances. Id. The statute itself states what a reasonable, prudent person would
have done. Id. If an excuse is not raised, the only inquiry for the jury is whether the
defendant violated the statute or regulation and, if so, whether the violation was a
proximate cause of the accident. Id.
          For an administrative rule or regulation to be a standard for negligence, a
purpose of the rule must be to afford protection to the class of persons to which the
injured party belongs from the hazard involved in the particular case. Cont’l Oil Co.
v. Simpson, 604 S.W.2d 530, 534 (Tex. Civ. App.—Amarillo 1980, writ ref’d n.r.e.);
see also Carter, 584 S.W.2d at 278. Section 91.101 of the Texas Natural Resources
Code specifically provides that the Commission “shall adopt and enforce rules and
orders . . . to prevent pollution of surface water or subsurface water in the state.” 
Tex. Nat. Res. Code Ann. § 91.101 (Vernon Supp. 2004-2005). Rule 8, subsection
(b) states that “[n]o person conducting activities subject to regulation by the
commission may cause or allow pollution of surface or subsurface water in the state.” 
16 Tex. Admin. Code § 3.8 (2004) (Tex. R.R. Comm’n, Water Protection).           Rule 8 clearly affords protection to the class of persons to which appellants
belong, i.e., surface owners, against the hazard involved, i.e., pollution of surface and
subsurface water. Therefore, negligence per se applies to the facts of this case. 
Accordingly, the trial court abused its discretion by refusing to submit an instruction
on negligence per se. However, because the jury found Texical negligent under the
common-law definition, the trial court’s error was harmless. 
          We overrule appellant’s fourth issue. 
E.      Legal Sufficiency
          In their fifth issue, appellants challenge the legal sufficiency of the evidence
to support the jury findings in questions five, seven, and eight.


 Appellants argue that
the trial court erred in denying their motion to disregard these jury findings because
the jury’s answers to these three questions were not supported by the evidence.
          1.       Question 5—Ranchquest
          Jury question five asked, “Do you find that Ranchquest, Inc. failed to comply
with paragraphs 14 and 15 of the lease?” The jury answered, “No.”
          Appellants claim that the jury’s refusal to find that Ranchquest failed to comply
with paragraphs 14 and 15 of the lease was not supported by the evidence.


 
Appellants contend that “Texical and Amcas were responsible for Ranchquest’s
performance of the Best Lease and became responsible for compliance with the Best
Lease.” They also argue that “Texical was the successor operator and was
responsible for compliance with the oil and gas lease as Ranchquest’s assignee and
designated operator.” The lease states, “Lessee and/or his successors in interest, shall
compensate the Grantee . . . .” (Emphasis added.) The jury could have reasonably
concluded that only Texical, as Ranchquest’s successor operator, was negligent and,
thus, responsible for the damage caused to appellants’ property. 
          We overrule that part of appellants’ fifth issue complaining about the jury’s
response to question five.
          2.       Question 7—Damages
          Appellants contend that there is no evidence to support the jury’s answers to
question seven. Question seven and the jury’s answers were as follows:
What sum of money, if any, now paid in cash, would fairly and
reasonably compensate Plaintiffs for their damages, if any?
 
Do not include any amount for any condition existing before the
occurrence in question, except to the extent, if any, that such other
condition was aggravated by any injuries that resulted from the
occurrence in question.
 
Do not include in your answer any amount that you find Plaintiffs
could have avoided by the exercise of reasonable care.
 
Consider the following elements of damages, if any, and none
other:
 
1)the reasonable and necessary cost to remediate the surface
of Plaintiff’s land.
 
                              Answer: $200,000
 
2)the diminution, if any, in the fair market value of the
Plaintiff’s land.
 
                              Answer: $0
 
          Because part one of question seven is the measure of damages for a temporary
injury to property, it is immaterial to this appeal. We therefore consider only the
jury’s finding in part two of question seven. Inasmuch as appellants had the burden
of proving the diminution in fair market value to their land, we construe their issue
to assert that they established the diminution in value as a matter of law. See Sterner
v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989). 
          In reviewing a challenge by the party with the burden of proof to an adverse
jury finding, we must first examine the record for evidence supporting the finding,
ignoring all evidence to the contrary. Id. If there is no evidence to support the
finding, we must examine the entire record to see if the appellant has established the
contrary proposition as a matter of law. Id.; see also Ritchey v. Crawford, 734
S.W.2d 85, 86 (Tex. App.—Houston [1st Dist.] 1987, no writ) (stating that appellate
court must determine whether evidence as matter of law requires conclusion contrary
to verdict). 
          Two witnesses testified regarding the property’s diminution in value: Haley,
a real estate appraiser who testified for the appellants, and Moorman, a real estate
appraiser who testified for appellees. Haley testified that the fair market value of
appellants’ property was $730,000 before the contamination and $430,000 after the
contamination.
          Moorman testified that he had been told that real estate with a pocket of
contamination could be sold by cutting the contaminated area from the sale and that
the diminution in fair market value would be the number of acres times the value per
acre. In this case, the number of contaminated acres was four, and Moorman valued
the property at $750 per acre. Moorman testified that, although the contaminated area
was a small percentage of the entire tract, he would not go so far as to say that there
was no diminution in market value. He calculated that the maximum diminution in
value of appellants’ property would be $3,000. 
          Appellees suggest that, because there had been previous oil and gas operations
on the property, the jury could have reasonably determined that any diminution in
value was due to those earlier operations. However, they do not direct us to any
evidence of contamination that existed before drilling on the Best wells was begun. 
Appellees also contend that their offer to buy the property for $730,000 was proof
that there was no diminution in value. In Texas, unaccepted offers to purchase
property are no evidence of market value of property. Hanks v. Gulf, Colo. & Santa
Fe Ry. Co., 320 S.W.2d 333, 336-37 (Tex. 1959); Lee v. Lee, 47 S.W.3d 767, 785
(Tex. App.—Houston [14th Dist.] 2001, pet. denied). 
          Our examination of the record does not reveal any evidence to support the
jury’s finding of $0 diminution in the fair market value of the land. Therefore, we
must determine whether appellants established the amount of diminution as a matter
of law. 
          Appellants contend that they established $300,000 diminution in value as a
matter of law, arguing that Moorman’s testimony of a maximum of $3,000 diminution
was not contained in a written report and was “off the cuff.” Because appellants did
not object to Moorman’s testimony during trial, they have waived any objection to it
on appeal.


 See Tex. R. App. P. 33.1. 
          The evidence regarding the amount of diminution in value was conflicting. 
Given this conflict, appellants have not established, as a matter of law, the diminution
in fair market value of their land. 
          We overrule that part of appellants’ fifth issue complaining about the jury’s
response to part two of question seven. 
          3.       Question 8—Attorneys’ Fees
          Appellants contend that the jury’s answers to question eight is not supported
by the evidence. In question eight, the jury found that $88,000 was a reasonable and
necessary fee for the services of appellants’ attorneys at the trial level, but made no
award for appellate fees. We need not address this issue because appellants requested
attorneys’ fees for their breach-of-contract claim. The jury did not find that appellees
breached their contract with appellants, and the trial court did not award attorneys’
fees.  
III. Conclusion
          We affirm the judgment.
 
 
                                                                        Sam Nuchia
                                                                        Justice

Panel consists of Chief Justice Radack and Justices Nuchia and Hanks.