COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| M.W. SULLIVAN, AS TRUSTEE OF THE SULLIVAN CROSBY TRUST, | § | No. 08-10-00267-CV |
| | § | |
| Appellant, | § | Appeal from |
| | § | |
| v. | § | County Court at Law No. 5 |
| | § | |
| BROKERS LOGISTICS, LTD., AND FOXWORTH-GALBRAITH LUMBER CO., | § | of El Paso County, Texas |
| | § | (TC# 2007-4448) |
| | § | |
| Appellees. | | |

**O P I N I O N**

For the second time in a matter of weeks, we are presented with ramifications of the great flood of August 2006. M.W. Sullivan, acting as trustee of the Sullivan Crosby Trust, appeals from a summary judgment granted in favor of Brokers Logistics, Ltd. and Foxworth-Galbraith Lumber Company. For the reasons that follow, we reverse and remand.

**FACTUAL SUMMARY**

On October 5, 2007, Sullivan, acting in his capacity as trustee of the Trust, filed this lawsuit against Brokers and Foxworth, alleging that they proximately caused temporary injury to Trust commercial property in El Paso, and seeking damages and injunctive relief.[1] Sullivan premised his lawsuit on four distinct legal theories: negligence, trespass, nuisance, and violation of Texas Water

---

[1] Texas law recognizes two types of injury to real property. "Permanent injuries to land result from an activity of such a character and existing under such circumstances that [they] will be presumed to continue indefinitely; the injury must be constant and continuous, not occasional, intermittent or recurrent." *Bayouth v. Lion Oil Co.*, 671 S.W.2d 867, 868 (Tex. 1984). "Temporary injuries, however, have been found where the injury is not continuous, but is sporadic and contingent upon some irregular force such as rain." *Id. See Nugent v. Pilgrim's Pride Corp.*, 30 S.W.3d 562, 567-71 (Tex.App.–Texarkana 2000, pet. denied); W. Dorsaneo, *Texas Litigation Guide* § 20.04[1] (2011) (discussing cases).

Code section 11.086(a).[2]  His amended petition read in part as follows:

> 8. Plaintiff owns several adjoining tracts of real property municipally numbered as 7155-7189 Merchant Blvd., El Paso, Texas (the "Property"). Immediately north of Plaintiff's Property is a strip of land owned by members of the Bassett family (the "Bassett Property"). The Union Pacific Railroad maintains a railroad track through the Bassett Property. Several pipelines maintain easements through the Bassett Property. Defendants' properties are located north (upstream) of this strip of land and the surface waters from these properties drain across the Bassett Property onto Plaintiff's Property.

> . . .

> 13. As a result of the failure of Defendants to account for the stormwater runoff generated by the development of their properties as well as by the acceleration of the runoff that comes onto their property, the accelerated runoff hits the unprotected Bassett Property. During large storm events, upstream runoff discharges in a southerly direction onto the Bassett Property. This runoff causes sediment transport of uncompacted soft soil material onto the railroad spur located north of Plaintiff's Property, completely covering it.

> 14. As a result of off-site drainage runoff entering the Bassett Property, silt material has been transported and deposited on the railroad track spur located north of the Plaintiff's Property, making it difficult for Plaintiff's tenants to utilize the existing spur and diminishing the value of Plaintiff's Property.

> . . .

> 20. Plaintiff fears that Defendants will persevere in the continued diversion and acceleration of surface water onto Plaintiff's Property. Defendants are committing a continuing tort and/or in the alternative causing temporary damage.

Brokers deposed the Trust's designated representative, Gordon W. Foster. Foster's deposition testimony included the following:

Q: Okay. What is your relationship with the Sullivan Crosby Trust?

A: I manage their properties in El Paso.

---

[2] Section 11.086(a) provides: "No person may divert or impound the natural flow of surface waters in this state, or permit a diversion or impounding by him to continue, in a manner that damages the property of another by the overflow of the water diverted or impounded." TEX. WATER CODE ANN. § 11.086(a) (West 2008).

. . .

Q: How long have you been the manager for the trust?

A: God, I don't know.  Probably 30 years.

. . .

Q: What was the [Trust] property used for since its acquisition?

A: It's warehousing.

Q: Has it always been rented/leased?

A: Yes.  And it's been available for rent or lease.

. . .

Q: When did you first begin this process [of determining what could be done about the drainage]?

A: I – you know, it was – it took me, I think, maybe 15 months or more to put together all the basic documents on this prior to [my attorney] actually filing suit.

. . .

Q: You began this process in '06?

A: That would be – I would say, you know, part of the genesis of this was certainly probably August/September '06 and the large amount of drainage that was coming down.

. . .

Q: Were you experiencing problems, silt buildup on the property, before August of '06?

A: Absolutely.

Q: Has that always been a problem?

A: No.  And I don't know at what point – you know, I don't know at what point it really became a problem.  If you take the instance, Brokers Logistics, that – Brokers

-3-

occupies a site that originally was occupied by Tri-State Grocers . . . . And my recollection is that the building that Tri-State was in didn't occupy as much of the site as Brokers does today and, therefore, probably didn't drain the way it does now.

At some point, a building was put onto what's now the Brokers Logistics' site, and a drainage pipe that maybe is 15 to 18 inches in diameter was put in. And that pipe empties directly onto the Bassett property . . . . And I'd say that would have been, you know, probably one of the initial real contributions to the drainage onto this site.

If you go to Foxworth Galbraith, I don't remember how that site was developed and how that drained and when that started doing what it's doing. As it has – it simply is covered with improvements and paving, and all the water just runs off the end of the site onto the Bassett property . . . .

So you probably have a period of time, probably a number of years, over which the drainage issue changed and built up.

Q: As you sit here today, you don't have any kind of recollection of when that period of time was? Was it ten years ago?

A: Well, I'd have to go back and, you know, look at sort of the relevant city information on that. But it's certainly in the neighborhood of ten years or so. It could be more than that, but it's certainly along those lines.

.  .  .

Q: Anytime before the '06-'07, did you contract with anyone to remove sand or silt from the railroad spur?

A: We've had people from time to time clear out that – clear out – clean up the area and occasionally take some sand out. But as a whole, we haven't done much in that respect just because it was a self-defeating thing. It just kept coming down.

.  .  .

Q: When is the first time you saw or observed what you thought was excess drainage or silt buildup on the tracks behind the Sullivan property?

A: I don't know. It would be many years ago.

Q: Give me an estimate.

A: More than 10? 10 or more? You know, a lot of years.

.  .  .

Q: All right.  Now, the – on these occasions – let me ask this.  When is the first time since you've been involved that you hired somebody – that Best hired somebody – when I say "you," I mean Best – to do some, you know, reworking or cleaning or clearing the spurs?

A: Oh, it's been – it's been over a number of years from time to time.  You know, when you characterize that, it's been more cleaning the area.  You could go out there today and you could find little trees growing up . . . .  We have to go out there periodically and cut them down.
　　　You'll have – people used to go out and just dump sofas and whatever back there, and we'd clear that out.  And then there have been a few times when we've done something about sand removal but, generally, not that much.

Q: When is the first time – well, strike that.  Going back to what you just said, with respect to just sand, clearing the tracks of sand, when is the first time you remember doing that?  Does that also go back more than 10 years ago?

A: I mean, it's been long enough that I'd say – I'd say it this way.  There may be one time when we endeavored to clear the tracks of sand.  But those efforts have generally been, you know, in the 2006 and subsequent time periods.
　　　And, again, I've answered that question one way in particular, that we didn't clear the tracks of sand, because the stuff just kept draining down and coming down over the years.

.  .  .

Q: Just with respect to – I understand there's all these other – these other issues, there are all these things about keeping the area clean and the vegetation and so forth.

A: Yeah, yeah, yeah.

Q: But just with respect to the efforts of hiring a contractor to go out there and get the track clear of sediment, silt, and sand?

A: It's probably about 10 years ago.

Brokers and Foxworth, relying upon Foster's testimony, filed traditional motions for summary judgment, arguing that Sullivan's claims were barred by the two-year statute of limitations.  *See* TEX. R. CIV. P. 166a.  They argued, in identical language, that,

-5-

Athough Plaintiff fails to identify the date by which the unlawful [injury] occurred to its property, Foster testified that the alleged problem had been present for at least ten years.

. . .

Because the circumstances giving rise to Plaintiff's alleged claims have been present and known by Plaintiff for at least ten years, Plaintiff's suit was not timely filed and is barred by limitations.

Sullivan filed written responses to the motions for summary judgment, arguing that "Plaintiff's injuries are temporary in character as opposed to permanent" and that, under Texas law, "damages . . . may be recovered for [such] injuries sustained within the two years prior to filing suit." Sullivan maintained that, according to Foster's testimony, "[a]ny significant cleanup in regards to the [railroad] tracks was done in 2006, subsequent to the storm, with one instance approximately ten years [earlier]." Finally, he alleged that, "[a]lthough excess drainage or silt buildup on the tracks had occurred years prior, Defendant[s] ha[ve] failed to [conclusively] establish that this was constant and continuous." The trial court, without explaining its reasoning, granted Brokers' and Foxworth's motions for summary judgment and ordered that Sullivan's claims be dismissed.

## STANDARD OF REVIEW

In a summary judgment motion brought under Texas Rule of Civil Procedure 166a, the moving party has the burden of showing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *Browning v. Prostok*, 165 S.W.3d 336, 344 (Tex. 2005). To determine whether a disputed issue of material fact precludes summary judgment, the court construes all competent evidence in favor of the nonmovant as true, indulging every reasonable inference and resolving any doubts in favor of the nonmovant. *American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997).

A defendant moving for summary judgment on the affirmative defense of limitations has the burden of conclusively establishing that defense. *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). Thus, the defendant must conclusively prove when the plaintiff's cause of action accrued. *Id.* Generally, a cause of action accrues when facts exist that authorize a claimant to seek judicial relief. *Schneider Nat. Carriers, Inc. v. Bates*, 147 S.W.3d 264, 279 (Tex. 2004). An issue is conclusively proven if reasonable minds would necessarily agree regarding the conclusion to be reached from the evidence. *Triton Oil & Gas Corp. v. Marine Contractors*, 644 S.W.2d 443, 446 (Tex. 1982).

A cause of action based upon permanent injury to land accrues on the date of discovery of the first actionable injury. *Bayouth v. Lion Oil Co.*, 671 S.W.2d 867, 868 (Tex. 1984). In contrast, a cause of action based upon temporary injury to land may be brought within two years of when that temporary injury was sustained. *Id.* Whether summary judgment should be granted is a question of law, and we review the trial court's decision on that question *de novo*. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156-57 (Tex. 2004).

### WAS THE INJURY PERMANENT OR TEMPORARY?

To be entitled to summary judgment in the instant case, Brokers and Foxworth had the burden of conclusively proving that the alleged injury to the Trust property was a permanent injury that occurred more than two years before Sullivan filed suit. All parties point to *Schneider* as the lodestar for determining whether the injury here was permanent or temporary.

*The Schneider Rule*

The Supreme Court began its opinion by noting that the distinction between a temporary and permanent nuisance is one of the oldest and most complex in Texas law. *Schneider*, 147 S.W.3d at

-7-

268.  "A permanent nuisance claim accrues when injury *first* occurs or is discovered; a temporary nuisance claim accrues *anew* upon each injury."  *Id.* at 270.

> We define a permanent nuisance as one that involves "an activity of such a character and existing under such circumstances that it will be presumed to continue indefinitely."  Thus, a nuisance is permanent if it is "constant and continuous," and if "injury constantly and regularly recurs."
>
> Conversely, a nuisance is temporary if it is of limited duration.  Thus, a nuisance may be considered temporary if it is uncertain if any future injury will occur, or if future injury "is liable to occur only at long intervals."  A nuisance is also temporary if it is "occasional, intermittent or recurrent," or "sporadic and contingent upon some irregular force such as rain."  [All footnote citations omitted].

*Id.* at 272.  While the line between temporary and permanent nuisances may be simply stated, the court found that its application to the facts of each particular case has been problematic:

> Texas courts addressing very similar cases have reached very different results. For example, in *Kraft v. Langford,* we held flooding caused by a storm sewer in Montgomery County was a temporary nuisance as a matter of law.  But in *City of Amarillo v. Ware,* we held flooding caused by a storm sewer in Amarillo was properly pleaded as a permanent nuisance.  It is not clear from either opinion why heavy rains near the Gulf Coast *must* be considered temporary, while those in the Texas Panhandle do not.

*Id.* at 273-74.  The court then traced the history of distinction, noting that the question of the temporary or permanent character of injury to land was initially conceived as an aspect of damages.

> At common law, a plaintiff suing for a continuing invasion of his land could recover for only those damages accrued by the time of trial. To relieve the burden placed upon an aggrieved landowner to bring successive suits, the courts developed the concept of permanent injury to permit the recovery of past and future damages.

*Id.* at 275, *citing Atlas Chem. Indus., Inc. v. Anderson,* 524 S.W.2d 681, 684 (Tex. 1975).  If future harm is reasonably predictable, said the court, then the nuisance is a permanent one.  *Id.* at 278.  "But if future harm is anyone's guess, the nuisance is a temporary one . . . ."  *Id.*

The court then addressed frequency.  If a nuisance occurs several times before trial and is

likely to continue, jurors will generally have sufficient evidence to evaluate the impact on neighboring property values. *Id.* at 280. "Conversely, a nuisance as to which any future impact remains speculative at the time of trial must be deemed 'temporary.'" *Id.*

> Even if a nuisance causes annoyance only during certain weather conditions or certain months, annual experience should provide a sufficient basis for evaluating the nuisance. **Absent evidence that current experiences are unrepresentative** or about to change, such nuisances should be considered "permanent" as a matter of law.

*Id.* (emphasis added). Aye, there's the rub. *Schneider* did not involve storm waters or a 100-year desert flooding event.

*The Great Flood of 2006*

**USA Today Aug. 7, 2006 (AP)**
http://www.usatoday.com/weather/stormcenter/2006-08-06-ElPaso-floods_x.htm.

> More than 15 inches of rain — nearly twice the annual average for the desert city — has fallen in El Paso since July 27, City Manager Joyce Wilson said. The deluge sent mud and rocks cascading into some parts of the city, destroying as many as 300 homes and causing an estimated $100 million in damage, Wilson said.

.   .   .

> "The infrastructure of this community performed well, it has performed well under devastating conditions," said Wilson, who added that **storms of this magnitude likely only hit the city once every 500 years or so.** (Emphasis added).

**The Weather Channel**
Dr. Greg Forbes, Severe Weather Analyst, Aug. 4, 2006
http://www.weather.com/blog/weather/8_10120.html

> On Tuesday the official El Paso rainfall, from the airport on the east side of the city, was 2.84 inches, and the highest hourly rate was 0.41 inches. **Now that was the third highest daily rainfall in El Paso history, with records going back to 1880, and the most daily rain since 1881!** Still, such significant flooding doesn't typically happen with total rainfalls and rates that low. (Emphasis added).

.   .   .

Places on the west side of the city got up to 6 inches of rain measured at one location, and perhaps even more in some spot. These are much more typical of amounts that give major flood events. Further, 4 to 5 inches of rain fell on the Franklin Mountains there and ran rapidly down the slopes, sending basically a surge of water and mud across Mesa Street and adjacent areas.

***Texas Almanac***
E. Alvarez (ed.), *Texas Almanac 2010-2011*, p. 141
(Tex. State Hist. Ass'n 2010) (emphasis in original).

**Aug. 1, 2006: Thunderstorms. El Paso.** Storms in a saturated atmosphere repeatedly developed and moved over mainly the northwest third of El Paso County, concentrating in an area near the Franklin Mountains. Rainfall reports varied from 4-6 inches within 15 hours, with an isolated report of about 8 inches on the western slope of the mountain range. Antecedent conditions from 4 days of heavy rains, combined with terrain effects of the mountains, led to excessive runoff and flooding not seen on such a large scale in the El Paso area in more than 100 years. Property damage was estimated at $180 million.

***National Weather Digest***
Volume 33, No. 1, Aug. 2009 p. 87-88

**Meteorlogical Aspects of the 2006 El Paso Texas Metropolitan Area Floods**
J. Rogash, M. Hardiman, D. Novlan, T. Brice, V. MacBlain
NOAA/National Weather Service
Weather Forecast Office
Santa Teresa, New Mexico/El Paso, Texas

The worst flooding in recorded history for the EPMA[3] occurred on 1 August 2006 when 3 to almost 10 in of rain fell over portions of the region.

.  .  .

Note that the northwestern portions of the city had the heaviest amounts, nearly 10 in (250 mm), while 4 to 7 in of rain fell across the north and northeastern sections of the city. Prolonged and occasionally heavy rainfalls forced arroyos and streams to rapidly overflow, causing streets to become raging torrents of water. The floodwaters severely damaged or destroyed homes, businesses and other property and overturned or carried away motor vehicles. Many roads were closed, including Interstate 10, leaving the EPMA literally isolated for several hours. In the city of El Paso, water rescues were required in some neighborhoods. Just north of El Paso, the entire

---

[3] EPMA is the acronym for El Paso Metropolitan Area.

village of Vinton, Texas was evacuated as arroyos overflowed, streets flooded, and water rose to a depth of almost five feet in some neighborhoods. Extensive flooding also damaged or destroyed much of Canutillo where high waters inundated homes and closed roads. Later in the summer, public safety officials declared portions of Canutillo permanently uninhabitable as a result of the floods.

*The Testimony*

A careful review of the testimony reveals: (1) Foster managed the Trust property in El Paso for approximately 30 years; (2) in 2006 he began looking into what could be done about the drainage onto the Trust property from the Brokers and Foxworth properties; (3) "part of the genesis" of his efforts in that regard was "August/September '06 and the large amount of drainage that was coming down" at that time; (4) before 2006 there was silt buildup on the Trust property due to drainage from the Brokers and Foxworth properties, but the silt buildup had not always been a problem; (5) Foster did not know at what point the silt buildup became a problem; (6) "the drainage issue changed and built up" over a period of many years; (7) before 2006 Foster occasionally hired people to remove "some sand" from the railroad spur on the Bassett property; (8) he first saw silt buildup on the railroad spur "10 or more" years earlier; (9) before 2006 "[t]here may be one time when we endeavored to clear the tracks of sand"; and (10) he hired a contractor to clear the tracks of sand "about 10 years ago." The significance of this testimony is that before 2006, there was some buildup of silt and sand. During 2006, things changed. Something happened – an event of such magnitude that commentators described it as a 100-year or 500-year event.

The *Schneider* opinion provides us with the following directive:

Accordingly, we hold that a nuisance should be deemed temporary only if it is so irregular or intermittent over the period leading up to filing and trial that future injury cannot be estimated with reasonable certainty. Conversely, a nuisance should be deemed permanent if it is sufficiently constant or regular (no matter how long between occurrences) that future impact can be reasonably evaluated. Jurors should

be asked to settle the question only to the extent there is a dispute regarding what interference has occurred or whether it is likely to continue.

*Schneider*, 147 S.W.3d at 281.  There is such a dispute here.  For these reasons, we sustain both

issues for review, and reverse and remand for further proceedings.


ANN CRAWFORD McCLURE, Chief Justice

January 11, 2012

Before McClure, C.J., Antcliff, J., and Chew, C.J., (Senior)
Chew, C.J., (Senior), sitting by assignment